2021 IL App (2d) 190966-U
No. 2-19-0966
Order filed June 14, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17-CF-1227 |
| SAVAUGHN STRICKLAND, | ) ) ) | Honorable Kathryn D. Karayannis, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices Jorgensen and Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant was proved guilty of drug possession based on two baggies of drugs recovered from his person after a traffic accident. The baggies were recovered during a second search of defendant, after the officer who had stopped defendant had turned off his squad car camera and before defendant was transported in a police van. However, it was plausible that the baggies were overlooked during the first search. Also, the officer had turned off his camera because he had already searched defendant (unsuccessfully) and was simply waiting for defendant to be transported.

¶ 2    Defendant, Savaughn Strickland, appeals from his conviction of unlawful possession of a controlled substance (720 ILCS 570/402(c) (West 2016)). Defendant argues that the State failed to prove him guilty beyond a reasonable doubt. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On June 28, 2017, defendant's vehicle was stopped by an Aurora police officer investigating a report of a vehicle hitting a tree. The stop lead to the discovery of a small baggie of cocaine weighing approximately 0.3 grams in defendant's pocket and a small baggie of suspected cannabis in defendant's mouth. Defendant was indicted on one count of possession of a controlled substance (*id.*). He was also issued a traffic citation for driving with a revoked driver's license (625 ILCS 5/6-303(a) (West 2016)). The matter proceeded to a jury trial.

¶ 5     The following relevant evidence was presented at trial. City of Aurora police officer Christopher Grandchamp testified that, on June 28, 2017, at about 2:08 p.m., he responded to a report of a hit-and-run, in the area of Second Avenue and Smith Street in Aurora, involving a black BMW with out-of-state license plates. When he arrived on the scene, Grandchamp observed a black Mercedes with front-end damage and a tree with fresh damage to the bark. The vehicle had out-of-state license plates. As the vehicle began to drive away from the scene, Grandchamp activated his squad car's overhead lights and followed the vehicle as it continued for about a hundred feet before pulling over. Grandchamp identified defendant as the driver of the vehicle.

¶ 6     Grandchamp testified that he approached the vehicle and asked defendant for his driver's license. Defendant told Grandchamp that he did not have one. Grandchamp asked defendant "why he didn't have a license, if it was suspended or such?" Defendant told Grandchamp "that his license was suspended." Defendant also told Grandchamp that he had hit the tree, left the area, and then returned to retrieve his car parts. While speaking with defendant, Grandchamp learned that defendant's license was revoked. Grandchamp also smelled an odor of cannabis emanating from the vehicle. Grandchamp asked defendant to step out of the vehicle. Grandchamp then searched defendant "in a compartmentalized way that [he] [does] every time." Grandchamp

testified that the purpose of the search was to look for cannabis. Grandchamp testified that, while he was searching defendant, defendant "was squirming back and forth, just squirming. Didn't seem like he wanted me to search." When Grandchamp was asked to described what he meant by " 'squirming,' " Grandchamp explained: "He was moving away from where I was trying to reach my hands, bending at the knees and the waist back and forth." Grandchamp did not find anything during his search. Grandchamp took defendant into custody because he was driving with a revoked driver's license.

¶ 7    Grandchamp testified that Aurora police officer Danny Rios arrived with a transport van to transport defendant to the police station. Rios searched defendant prior to placing him in the van. The search was done behind Grandchamp's police car. Grandchamp observed Rios remove a "clear plastic bag with a rock-like substance" from defendant's front left pocket. Grandchamp described it as a "small bag" that was "closed" and "wrapped, twisted at the top." Grandchamp identified People's exhibit No. 1 as the item retrieved from defendant's pocket. Grandchamp did not feel the bag when he conducted the initial search of defendant. Grandchamp testified further that, during Rios's search of defendant, Rios noticed that defendant "was talking kind of funny." Grandchamp ordered defendant to spit out what he had in his mouth. Defendant did not immediately comply. Rios grabbed defendant's head and put his hand near defendant's jawline. Defendant eventually spit out what was in his mouth, which was a "plastic bag [containing] a plant-like substance." Grandchamp testified that the bag was "[c]losed and twisted at the top." Grandchamp identified People's exhibit No. 2 as the item recovered from defendant's mouth. Grandchamp identified People's exhibit Nos. 5 through 13 as various photographs that were admitted into evidence, including photographs of (1) the items recovered from defendant's mouth and pocket, (2) defendant's vehicle, (3) parts of defendant's vehicle, and (4) the tree.

¶ 8    Grandchamp testified that his squad car was equipped with a video recording system. Grandchamp wore a microphone that would sync with whichever vehicle he was driving on a particular day. The video recording system begins recording when the emergency lights are activated. On the day of the incident, the squad car video, which showed the front of his squad car, began recording when he first activated his emergency lights, and it recorded Grandchamp's interactions with defendant. The search conducted by Rios was not captured on video, because the search took place behind Grandchamp's squad car after the video recording terminated. Rios cannot be seen at any point in the video. The video was admitted into evidence as People's exhibit No. 3B and played for the jury.

¶ 9    On cross-examination, Grandchamp acknowledged that, when he first approached the vehicle, he did not see defendant make any movements with his head or hands. As Grandchamp approached, defendant opened the door to speak with him because the window was not working. Defendant answered all of Grandchamp's questions. Grandchamp acknowledged that he did not smell cannabis at that time and that he did not make a note of the odor in his police report. He did not see defendant put anything in his mouth or pockets.

¶ 10    Grandchamp further testified that he would not be surprised to learn that his search of defendant took 40 seconds, and he agreed that he did not find anything on defendant. Grandchamp acknowledged that, as can be seen on the video, he and Officer Rodarte searched defendant's vehicle while Aurora police officer Salvador Contreras stood with defendant in front of Grandchamp's squad car. The search did not uncover anything. Grandchamp acknowledged that he turned off his microphone prior to the search conducted by Rios.

¶ 11    Grandchamp was shown People's exhibit No. 1, the baggie of cocaine, and testified that it was "wrapped really tightly, twisted." When asked if it was "[t]ied and knotted," he

responded, "I don't know if it was knotted or not. I remember it was like twirled." When asked if the baggie depicted in People's exhibit No. 2, containing the plant-like substance, was "also tied," Grandchamp responded: "Again, twisted." Grandchamp testified that defendant did not appear to clench his teeth, swallow excessively, or move his tongue to either cheek while talking. Grandchamp testified that he had handcuffed defendant and that he did not take the handcuffs off prior to Rios's arrival. Grandchamp agreed that, while speaking with Contreras at his vehicle, while defendant was handcuffed, he told Contreras that defendant appeared to be nervous. However, Grandchamp did not search defendant again.

¶ 12    On redirect examination, Grandchamp testified that defendant never told him that his license was revoked. Grandchamp also explained that he turned his microphone off because he was having a "personal conversation" with Contreras, and he "thought what [they] had dealt with was over." Grandchamp explained that the search of defendant and his vehicle was over and that Grandchamp was just waiting for another officer to transport defendant to the police station.

¶ 13    Officer Rios testified that, on the day at issue, he was working as a transport officer and was called to assist Grandchamp. When Rios arrived, he parked behind the officers' vehicles that were already present. Rios saw Grandchamp, Contreras, and defendant. They walked defendant to the rear of Rios's transport van, where Rios conducted "a very thorough search—pockets, pants, waistband—anywhere that we believe any contraband or anything can be hidden." Rios explained that individuals are routinely searched prior to entering the van to prevent any contraband from being brought into the jail. While searching defendant, Rios "located a rock-like substance in a plastic bag in his left front pant pocket." It was a "small baggy." Rios testified that he spoke to defendant during the search and "noticed plastic in his mouth." Rios asked defendant to spit it out, but defendant did not comply. Rios testified that it "[l]ooked like he was trying to chew it up to

swallow." Rios held defendant's head and placed his thumb along defendant's jawline to prevent him from swallowing what was in his mouth. Defendant was told to spit the item out and he did so. Rios testified that he observed "a leafy, green substance that was contained within a small plastic baggy." Defendant was then placed in the transport van.

¶ 14 On cross-examination, Rios testified that he did not prepare a report on the incident. Rios was wearing a microphone, but he could not remember whether it was on during the search. Rios was able to understand defendant even before Rios discovered and removed the item from his mouth. Asked again to describe that item, Rios said: "It was a plastic baggy or Saran Wrap that was tied off." When asked, "Tied off?" Rios responded: "Had a knot." He further stated that it was a "[s]mall" bag.

¶ 15 On redirect examination, Rios testified that he noticed an odor of cannabis when speaking with defendant. Rios testified that Grandchamp prepared a report that included Rios's involvement with defendant.

¶ 16 On recross examination, Rios testified that he was not required to turn on his microphone while putting defendant in the transport van, but he agreed that nothing prevented him from doing so. Rios did not prepare a report, because Grandchamp was standing next to him and Grandchamp had prepared a report. He agreed that nothing prevented him from preparing a report. Rios agreed that it was not uncommon for an officer to write an additional report "[u]nless you are the transportation van," in which case "[y]ou usually don't."

¶ 17 Pamela Wilson, a forensic scientist with the Illinois State Police, testified that People's exhibit No. 1 tested positive for cocaine and weighed 0.3 grams. On cross-examination, she agreed that she was only asked to determine what the item was; she was not asked to have the item tested

for DNA, fingerprints, or saliva. At the conclusion of Wilson's testimony, People's exhibit No. 1 was published to the jury "by way of passing it around."

¶ 18    Officer Contreras testified that he was called to the scene to assist Grandchamp. Contreras did not search defendant, but he observed Grandchamp do so. Contreras testified that "Grandchamp did more of a quasi pat-down search." Contreras stood by defendant while Grandchamp searched defendant's vehicle. Contreras did not participate in the second search of defendant conducted by Rios. Contreras heard Rios tell defendant, " 'Spit it out,' " which drew Contreras's attention to the back of the transport van, where Grandchamp and Rios were standing with defendant. Contreras testified that a bag was recovered from defendant's mouth. Contreras did not collect the bag.

¶ 19    On cross-examination, Contreras testified that he did not prepare a report of the incident. Contreras recalled being dispatched to a report of a vehicle striking a tree; there was no urgency to the call. Although Contreras was wearing a microphone, it was not turned on, because "[t]hat was Officer Grandchamp's camera" and "[i]t wasn't [Contreras's] stop." He was not "watching everything" with respect to Grandchamp's pat-down of defendant; he was "just kind of looking around making sure [they] are not going to have something else kind of pop up." Contreras can be seen on the video, standing in front of Grandchamp's squad car. Contreras was "[p]retty close" to defendant; they were about a "couple feet from each other." Contreras and defendant spoke for about 15 minutes; defendant was polite. When asked if he had any difficulty understanding defendant when they were speaking, Contreras testified:

> "I mean, you know, there was just—something just was off. But I mean, I never
>
> dealt with [defendant] before; so I didn't know if that was his normal or not so—"

Contreras never mentioned this to Grandchamp. Contreras did not see any plastic in defendant's mouth. Contreras did not recall defendant putting his hands in his pockets or near his mouth. Contreras did not recall if defendant clenched his teeth or moved his tongue.

¶ 20     Contreras testified that he did not remember defendant being handcuffed, but he did not dispute that he could have been. Contreras could not recall how long it took for Rios to arrive after Grandchamp requested the transport van. While waiting for the transport van to arrive, Grandchamp sat in the driver's seat of his squad car and Contreras stood by the door. Contreras agreed that if defendant were handcuffed prior to Rios's arrival, there would have been no reason to take the handcuffs off. Contreras did not recall who walked defendant over to the transport van.

¶ 21     After the State rested, defendant moved for a directed verdict, which was denied. Defendant did not present any evidence.

¶ 22     All of the exhibits, with the exception of People's exhibit Nos. 1 and 2, were sent back with the jury. During jury deliberations, the jury sent a note to the trial court asking to see People's exhibit No. 2, the bag of cannabis. The trial court brought the jury into the court room, where it was shown the bag of cannabis.

¶ 23     The jury found defendant guilty of unlawful possession of a controlled substance (720 ILCS 570/402(c) (West 2016)) and driving with a revoked driver's license (625 ILCS 5/6-303(a) (West 2016)). Defendant did not file a posttrial motion.

¶ 24     Following a sentencing hearing, on July 26, 2019, the trial court found that defendant's criminal history made him eligible for an extended-term sentence. The court sentenced defendant to four years in prison on the possession conviction and to a concurrent sentence of 364 days in jail on the traffic conviction. Defense counsel did not file a post-sentencing motion.

¶ 25    On February 27, 2020, we granted defendant's motion for leave to file a late notice of appeal, which was filed on February 18, 2020.  See Ill. S. Ct. R. 606(c) (eff. Jul 1, 2017).

¶ 26                                II. ANALYSIS

¶ 27    Defendant argues that the State failed to prove him guilty beyond a reasonable doubt, because the testimony of the officers was so improbable, unconvincing, and contrary to common human experience that it should be disregarded in its entirety.  We disagree.

¶ 28    When we review a challenge to the sufficiency of the evidence, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Jackson*, 2020 IL 124112, ¶ 64.  The reviewing court's role is not to retry the defendant. *Id.*  It is the trier of fact's responsibility to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts.  *Id.*  Thus, we will not substitute our judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses.  *Id.*  "A criminal conviction will not be set aside on a challenge to the sufficiency of the evidence unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt."  *Id.*

¶ 29    To convict a defendant of unlawful possession of a controlled substance, the State must prove beyond a reasonable doubt that the defendant had knowledge and possession of the controlled substance.   See 720 ILCS 570/402 (West 2016) ("it is unlawful for any person knowingly to possess a controlled *** substance"); *People v. Smith*, 288 Ill. App. 3d 820, 823-24 (1997).

¶ 30    Defendant argues that the officers' accounts of the events defy common sense, were inconsistent with the video evidence, and contradicted each other.

¶ 31 First, defendant contends that the officers' accounts of the events defy common sense, because Grandchamp and Contreras interacted closely with Strickland for about twenty-five minutes and did not find any controlled substances on him; yet, after Grandchamp turned off the video, Rios searched defendant and found the baggies. Defendant cites *People v. Vasquez*, 233 Ill. App. 3d 517, 527 (1992), where the court stated that, when testimony is "contrary to human experience," the reviewing court must reject it. Defendant's argument is not persuasive.

¶ 32 As for the baggie of cocaine, defendant argues that the fact that Grandchamp did not find anything in defendant's pocket during his search "strongly suggests" that the cocaine was not there. However, it is not beyond belief that Grandchamp missed the cocaine during his initial search. Grandchamp testified that defendant was " 'squirming' " during the search. Grandchamp explained: "He was moving away from where I was trying to reach my hands, bending at the knees and the waist back and forth." The jury viewed the video, which showed an obstructed view of the search, as it was blocked by Contreras who was standing near the vehicle. In the video, defendant can be seen moving during the search, and at one point, Grandchamp tells him to "stay still" and then asks, "What are you doing, dude, are you alright?" Defendant tells Grandchamp that he had a gunshot wound in his leg and that his leg "trembles a bit." Although defendant points out that the search was 40 seconds in duration, the 40-second search involved the entirety of defendant's lower body, not simply his left front pocket. Indeed, it appears in the video that Grandchamp put his hand in and out of the left front pocket of defendant's baggy-fitting pants relatively quickly. Moreover, the jury saw the actual baggie of cocaine that was found in defendant's pocket and was able to determine whether it could have been easily missed. The photograph of the baggie showed that it was about an inch wide when fully opened and weighed 0.3 grams. Given Grandchamp's testimony that the "small bag" was "wrapped really tightly" and

"twisted" when it was recovered from defendant's baggy-fitting jeans, it does not "strain[] credulity" to believe that Grandchamp failed to discover it during his initial search.

¶ 33    As for the baggie of suspected cannabis, defendant argues that it defies common sense that neither officer saw the baggie in defendant's mouth, because they interacted closely with defendant for about twenty-five minutes. Defendant argues that "[t]he bag is at least several inches wide" and would surely be noticeable to someone speaking closely to him. However, although the People's exhibit No. 6 shows that the *fully opened* baggie may have been about three inches wide, the baggie was not fully opened when it was retrieved from defendant's mouth. Grandchamp testified that the bag was "[c]losed and twisted at the top." Rios testified that "[i]t was a plastic baggy or Saran Wrap that was tied off" and that it was "[s]mall." In addition, the flattened suspected cannabis inside appears to measure no more than one inch. Thus, it follows that, given the small amount of suspected cannabis and the description of the baggie when retrieved, it is not inherently improbable that the baggie could have been concealed in defendant's mouth without detection. We also note that Contreras, when asked if he had difficulty understanding defendant when they were speaking, testified that "something just was off," but since he had never dealt with defendant before, he "didn't know if that was his normal or not." Defendant also argues that it was "improbable" that he was holding a baggie of cannabis in his mouth, because he asked to smoke a cigarette shortly after he was pulled over. We note, however, that defendant could have used this opportunity to secret the baggie in the first place. In any event, the jury specifically requested to see the actual baggie and was allowed to do so. It obviously accepted the officers' testimony. We cannot say that the testimony regarding the discovery of the baggie was so contrary to human experience that it must be rejected.

¶ 34    Defendant also contends that the testimony of the officers was inconsistent with the video evidence.  Defendant first argues that, although Grandchamp testified that he decided to search defendant after smelling cannabis, the video showed that Grandchamp was standing at the door for about eight minutes before doing so.  Defendant argues that it is highly unlikely that Grandchamp would not have smelled the cannabis sooner.  However, the fact that Grandchamp did not mention the cannabis for eight minutes does not mean he did not smell the cannabis sooner.  The video shows that, during that initial time, Grandchamp was attempting to gather basic information from defendant.  In addition to trying to ascertain what had happened with the vehicle accident and whether defendant was injured, Grandchamp was also obtaining personal information from defendant, such as his driver's license status, his name, and his address, as well as information about who owned the car and whether it was insured.  Although Grandchamp testified that he did not smell cannabis when the door was first opened, he certainly could have smelled it while interacting with defendant but simply did not mention it until after determining the nature of accident and gathering all of the necessary information from defendant.  We find no inconsistencies.

¶ 35    Defendant also argues that video rebuts Grandchamp's testimony that defendant did not pull over right away, insinuating that defendant may have been attempting to conceal something or attempting to avoid a police encounter.  According to defendant, the video shows that defendant "merely waited until he found a safe place to stop."  We disagree.  To be sure, the video showed that there were cars parked along the right side of the street as Grandchamp followed behind defendant.  However, there were a couple of opportunities to pull over that defendant passed by.  In any event, we note that when Grandchamp asked defendant why he took so long to pull over after Grandchamp activated his lights, defendant admitted, "I was scared, sir, I didn't have my

license." At no point did defendant claim that there were no available spaces. We do not find Grandchamp's testimony on the matter to be inconsistent with the video.

¶ 36 Defendant also argues that, although the State suggested that defendant lied about his license being revoked, the video revealed that defendant admitted that his license was invalid. According to defendant, it "appears" that defendant "simply agreed" with Grandchamp's use of the word suspended. However, our review of the video shows that, after defendant told Grandchamp that he did not have a valid driver's license, Grandchamp asked defendant, "What is it?" and Grandchamp and defendant simultaneously stated "suspended." Even if defendant "simply agreed" with Grandchamp's use of the word suspended, the fact remains that his license was not suspended, but had been revoked.

¶ 37 Defendant also argues that Grandchamp's explanation for turning off the video—that the encounter was complete and that he was having a personal conversation with Contreras—is suspect given the "contrary video evidence." Again, we disagree. Defendant had been searched, handcuffed, and was standing at the front of the squad vehicle. Contreras helped defendant dial his cell phone and placed the call on the hood of the squad car. Defendant was bending over talking on the phone. We find nothing suspect in Grandchamp's decision to turn off the squad car video as the officers were waiting for the transportation van to arrive.

¶ 38 Defendant next contends that the testimony of the officers contradicted each other. Defendant points out that Contreras testified that Grandchamp's initial search was a "quasi pat-down," whereas Grandchamp described it as a "compartmentalized" method, that Grandchamp testified that the baggie containing suspected marijuana was "twisted" closed whereas Rios testified that it "[h]ad a knot, " and that Contreras testified that he could not recall defendant being handcuffed, whereas both Grandchamp's testimony and the video showed otherwise. We will not

substitute our judgment for that of the trier of fact "where the evidence is merely conflicting, *e.g.*, where there are minor variations or discrepancies in *** the testimony of prosecution witnesses." *People v. Givens*, 46 Ill. App. 3d 1035, 1043 (1977).  The jury was in the best position to assess the officers' credibility, resolve any conflicts in their testimony, and draw reasonable inferences therefrom.  *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001).  As to whether the search could be described more properly as a "quasi pat-down" or a "compartmentalized" search, the jury saw the video and could judge which description was more accurate.  The jury could also have reasonably concluded that one officer could view the baggie as "twisted" closed while another officer viewed it as tied with "a knot."  Or the jury may have concluded that one of the officers faultily recalled the state of the baggie.  And the jury could have reasonably concluded that Contreras simply could not recall if defendant was handcuffed; indeed, Contreras did not dispute the possibility that he was.  "[I]t is for the factfinder to judge how flaws in part of the testimony affect the credibility of the whole."  *People v. Cunningham*, 212 Ill. 2d 274, 283 (2004).  These minor inconsistencies do not "ma[ke] it impossible for any fact finder reasonably to accept any part of it." *Id.*

¶ 39    Finally, defendant points to a comment made by Grandchamp on the video after he had already searched defendant—that he still suspected defendant of wrongdoing and that defendant's delay in pulling over suggested that he was perhaps shifting something around, such as "crack rock or something like that."  Defendant argues that, because he made "unsubstantiated assumptions about [defendant], who is Black," his testimony was suspect.  See, e.g., *State v. Brown*, 930 N.W.2d 840, 849 (Iowa 2019) ("An officer who engages in racial profiling is also likely to be willing to lie about it.")  We note that Grandchamp's suspicion was not unsubstantiated.  It was based on both defendant's failure to pull over right away and on defendant's "weird movement" during Grandchamp's search.  In any event, the State presented testimony from not only

Grandchamp but also Contreras and Rios. Indeed, it was Rios who testified that he searched defendant and recovered the two baggies. In any event, we note that the jury saw the video and heard Grandchamp's comment. Defendant argued strongly in closing argument that the officers were incredible and that the evidence had been planted. The jury considered all of the evidence and concluded otherwise.

¶ 40 After reviewing all of the evidence presented at defendant's trial in the light most favorable to the State, we cannot say that the evidence was so improbable, unsatisfactory, or contrary to human experience that it creates a reasonable doubt of defendant's guilt.

¶ 41                                    III. CONCLUSION

¶ 42     For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 43     Affirmed.