THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALBERTO VASQUEZ, Defendant-Appellant.

Second District   No. 2—90—0680

Opinion filed September 3, 1992.

G. Joseph Weller and Barbara R. Paschen, both of State Appellate Defender's Office, of Elgin, and Robert E. Farrell, of State Appellate Defender's Office, of Chicago, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers and Lawrence M. Bauer, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

Following a bench trial in the circuit court of Lake County, the defendant, Alberto Vasquez, was found guilty but mentally ill of two counts of criminal sexual assault (Ill. Rev. Stat. 1989, ch. 38, par. 12—13(a)(1)) and two counts of aggravated criminal sexual abuse (Ill. Rev. Stat. 1989, ch. 38, par. 12—16(d)). He was sentenced to a term of eight years in the Department of Corrections.

The defendant contends he was not proved guilty beyond a reasonable doubt of the criminal sexual assaults and that the court erred both in considering that factors in aggravation existed which justified

a sentence in excess of the minimum and in not specifying to which conviction or convictions the sentence was to be applied. We reverse the convictions for criminal sexual assault and remand the cause for resentencing.

Counts I and III charged that on or about February and May 1989, respectively, the defendant committed the offense of criminal sexual assault in that he "knowingly committed an act of sexual penetration with [P.L.], in that by the use of force, said defendant placed his penis in the mouth of [P.L.]." Counts II and IV charged that on or about February and May 1989, respectively, the defendant committed the offense of aggravated criminal sexual abuse in that he "knowingly committed an act of sexual penetration with [male minor] [P.L.], who was at least 13 years of age but under 17 years of age, in that the defendant placed his penis in the anus of [P.L.], and the defendant was at least five years older than [P.L.]."

The defendant was found to be mentally unfit to stand trial on October 24, 1989, and was committed to the Illinois Department of Mental Health in Elgin for the purpose of determining if he could be restored to a status of fitness to stand trial. On March 13, 1990, a restoration hearing was held, and the court found the defendant to be fit.

Lawrence Bonds, a Lake County probation officer, identified the defendant as one of the probationers assigned to his case load and established that the defendant had stated his date of birth to be July 2, 1951. Bonds identified People's exhibits Nos. 1, 2 and 3 as letters he had received from the defendant, and they were admitted into evidence. In one letter, dated April 30, 1989, the defendant wrote about his treatment in the alcohol program at the Veterans' Hospital in North Chicago which terminated when he became ill. In the other letters, both dated June 2, 1989, the defendant made references to the two incidents in February and May which are at issue here. In People's exhibit No. 1, the defendant refers to a 13-year-old boy named "Felip" [sic] "who is a sucker and a queer" and who "said he was living over in [the] North Chicago Navy base." The second time he met "Felip," they "walked to a tunnel under the railroad track." The defendant wrote that "the boy is living with foster parents who now live in Waukegan." In People's exhibit No. 2 the defendant wrote in part:

> "We [the defendant and the "13-year-old boy who used to live in one of the Navy base apartments"] set [sic] in the car and he suck [sic] me and when I gave him a right [sic—ride] I almost screwed him but no. [T]his happen [sic] back when it was cold

outside. In the month of May *** this boy named Felip [*sic*] walk[ed] by and greet[ed] me *** and [we] walked over to a tunnel that he mentioned ***. There we made love but we were interupted [*sic*] by a white couple ***. *** [H]e told me that he has done that *** more than once and as I looked and made love to him I found out that he has been abuse [*sic*] an[d] is being abuse [*sic*][;] he even said so him selves [*sic*]."

The State's witness, P.L., testified his birthdate was December 5, 1975. At the time of trial, he was 14 years old and was in the seventh grade in school. In February 1989, P.L. resided with his mother but was removed to a foster home in May of that year. In February, P.L. met the defendant in North Chicago, Illinois. It was cold outside, and P.L. entered defendant's vehicle at the defendant's suggestion. After entering the vehicle, the defendant touched with his hand P.L.'s leg and chest area. The defendant then unzipped his own pants, exposed his penis, engaged in masturbation and then put his hand on the back of P.L.'s head. P.L. testified the defendant then forced P.L.'s mouth onto his (the defendant's) penis. The defendant's hand was on the back of P.L.'s head while the defendant's penis was inside P.L.'s mouth. The defendant then exited the car to urinate. He reentered the car after about three seconds, turned P.L. over onto his stomach and lowered P.L.'s pants. The defendant then inserted just the head of his penis into P.L.'s rectum. While the defendant kept trying to insert his penis into P.L.'s rectum, P.L. tried to force defendant off of him, and the defendant finally did get off. P.L. told the defendant he had to go home, and the defendant told P.L. he would drive him home.

On the way to P.L.'s home, the defendant parked behind a bar in North Chicago. The defendant unzipped his own pants and his penis was erect. He again turned P.L. over onto his stomach, pulled down P.L.'s pants and tried to put his penis in P.L.'s rectum. The defendant was not able to get his penis in at all, and, during this period of time lasting between a couple of minutes and 30 minutes, P.L. was forcing the defendant off of him. P.L. told the defendant to "quit it" and pushed the defendant off of him. The defendant then dropped P.L. off on the corner where P.L.'s home was located. P.L. did not tell anybody what had just occurred because he was scared, although he was unable to say why he was afraid.

P.L. next saw the defendant in May 1989. P.L. was walking on Genesee Street on his way to a McDonald's restaurant when he saw the defendant talking with three other males. P.L. walked faster after he saw the defendant. The defendant rode after P.L. on a 10-speed

bike. The defendant tried to engage P.L. in conversation, but P.L. did not know what defendant was saying; he was not paying any attention to the defendant. P.L. then decided not to go to McDonald's and went down toward the lake. As P.L. and the defendant reached the area of the lake near some railroad tracks, the defendant wanted to go somewhere to talk, and P.L. said he guessed they could if the defendant would then leave him alone.

The defendant and P.L. went into a viaduct under a bridge. There, the defendant unzipped his own pants and manually stimulated his penis until it was erect. P.L. testified the defendant then put his hand on the back of P.L.'s head and forced P.L.'s head onto his (the defendant's) penis and inserted his penis into P.L.'s mouth. P.L. was trying to get defendant off of him while this was occurring but was unable to do so.

The defendant went to the other side of the bridge to urinate after P.L. was able to push him off of him. The defendant returned to where P.L. was and pulled P.L.'s pants back down because P.L. had pulled them up. The defendant positioned P.L. on P.L.'s back, raised P.L.'s legs up and inserted his penis into P.L.'s rectum. P.L. was "hurting" because of this, and he tried to, and did, push the defendant off of him after four or five minutes.

At the time P.L. was able to push defendant off of him, some other people were approaching the viaduct area, and the defendant zipped up his pants. P.L. was on his way out of the viaduct first, and the defendant ran after P.L., taking his 10-speed bike. The defendant caught up with P.L., took him behind a bush, exposed his still erect penis and told P.L. to put his mouth on his penis again. P.L. stated he just stood up and tried to walk away. The defendant came after him, but P.L. told him to leave him alone because he had to go home. The defendant suggested P.L. not go home because they could "go somewhere and go eat at a church." P.L. said, "No, I already got my own food at my foster house." P.L. then went back to his foster home. He did not tell anybody there what had happened because he was still afraid. The police came to his foster home in June 1989 to speak with him because the defendant left a letter on the door of the foster home. One of the foster children read it, told the foster mother about it, and she called the police.

On cross-examination, P.L. testified he was walking to his sister's house sometime after 10 p.m. on the night in February when he first encountered the defendant. P.L. testified he willingly entered defendant's station wagon, and he and the defendant talked together for between 30 minutes and an hour. The defendant never struck P.L., and

P.L. did not know if the defendant had locked the car doors because P.L. did not try to get out. The time that P.L. spent talking with the defendant was before the defendant touched him. P.L. did not try to exit the vehicle after the defendant had gotten out to urinate, and, upon reentering the vehicle, the defendant grabbed P.L.'s leg. During the time the defendant was outside the vehicle, P.L. did not run from the vehicle, he did not scream in the car at any time, and he did not fight the defendant at any time. Although the defendant forced P.L.'s head down to his (the defendant's) penis, it did not hurt P.L. When the defendant turned P.L. over onto P.L.'s stomach, P.L. tried to push the defendant off of him. P.L. also tried to force the defendant away from him when they were sitting next to each other because the defendant was "scooting" over toward P.L. When the defendant attempted to insert the head of his penis into P.L.'s anus, it hurt P.L., and he told the defendant that it did.

P.L. had never before been to the bar in North Chicago to which the defendant drove, and he did not know the name of it. While stopped and seated in the defendant's car, P.L. did not try to run away, nor did he try to fight the defendant; P.L. just sat there and did not pay any attention to the defendant. P.L. stayed in the car with the defendant because P.L. did not want to walk home. No one was outside the bar or on the street; everyone was in the bar. P.L. did not have any idea how much time he spent in the company of the defendant during this encounter. He did not willingly go to the location behind the bar. He did not try to run away, but he told the defendant to leave him alone.

The next time P.L. saw the defendant was in May 1989. When he saw the defendant, P.L. just kept walking but faster. When he saw the defendant following on his bicycle, P.L. ran forward. The defendant kept on following P.L., so P.L. decided to go with defendant to some railroad tracks in order to get him to leave him alone.

P.L. testified there were people by the railroad tracks and that he tried to run from the defendant by running toward the people. P.L. did not tell any of these people to help him, and he did not fight the defendant. P.L. did not think the defendant was going to do again what he had done in February; P.L. thought the defendant just wanted to talk to him. P.L. stated he tried to run from under the viaduct when the defendant went to urinate but stopped when the defendant ran after him. P.L. could not say why he stayed with the defendant at this time. He did not tell anyone at his foster home about this incident, nor did he ever tell anyone about the February encounter with defendant until the police came to see him. The

defendant did not hit P.L. in May, but it hurt when the defendant put his penis in P.L.'s rectum. P.L. told the defendant to stop, but he did not; he stopped only when P.L. was able to force the defendant off of him.

The State's next witness, William Genell, testified he was a Waukegan police officer assigned to the Lake County Children's Advocacy Center investigating sex offenses of adults involved with children. Officer Genell arrested the defendant on July 26 at the defendant's home and transported him to the Waukegan police station where he was placed in an interview room. Officer Genell advised the defendant of his rights, and the defendant signed a waiver and agreed to speak concerning his involvement with P.L. The defendant was understandable and coherent during this questioning. Officer Genell typed a statement from notes he had taken during the interview. Officer Genell reviewed the typewritten statement with the defendant, who made corrections thereon and then signed his name to it. Officer Genell read the defendant's statement into the record. On cross-examination, Officer Genell testified the defendant never said that he forced P.L. or that P.L. had tried to run away.

In his statement, the defendant admitted having oral sex with P.L. in February and that he ejaculated into P.L.'s mouth. Defendant acknowledged in his statement that P.L. "got scarred [sic—scared]" afterward and asked to be driven home. On the way there, the defendant pulled over and had P.L. pull down his pants. The defendant put some Vaseline on his penis and put it into P.L.'s anus for only one stroke "because P.L. didn't want to do it here." The defendant then dropped P.L. off at P.L.'s house.

Continuing with his statement, the defendant next saw P.L. when P.L. walked by him going north on Genesee Street. The defendant caught up to P.L. and asked him if he wanted to have sex with him under a bridge. P.L. directed him to a tunnel instead. P.L. performed oral sex on the defendant there, but the defendant did not ejaculate. The defendant then "inspected" P.L.'s anus, which the defendant thought "looked injured *** as if someone else had been in there." They were interrupted when a couple came into the area, and he and P.L. left. The defendant believed the couple "was a plot of some sort to interfere with us." In concluding his statement, the defendant said: "I should not have touched [P.L.] because of his age[.] I knew it was wrong."

The State rested its case, and the defendant's motion for a directed finding was denied. The defendant then tendered Dr. Suraleah Michaels as an expert witness in clinical psychology. The State stipu-

lated to Dr. Michaels' expertise, and she testified extensively as to defendant's inability to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law. Although the court found the doctor's expert opinion admissible, it did not feel it was sufficiently supported by a factual basis of examinations or other documentations so as to shift the burden of proof of sanity beyond a reasonable doubt to the State. Summation of Dr. Michaels' testimony is omitted here because it is not necessary to resolution of the issues raised in the defendant's appeal.

The defendant testified in his own behalf. He recalled that he first met P.L. in April rather than in February 1989. The defendant was staying at his mother's residence and felt he had to leave the apartment because he was hearing voices coming from the walls. As he exited the apartment, he saw P.L. and thought that the voices had something to do with P.L.'s presence. The defendant walked about three yards behind P.L. and intended to walk to the corner just to get away from the voices. The defendant was walking behind P.L. but was not following him. When the defendant reached the corner, he just stood where he normally does and P.L. approached him. The defendant testified the following conversation occurred:

> "I said, 'What are you doing around here? People like you around here. They get shaft by the black people,' and then [P.L.] said, 'Oh, I have two sisters that like to get shaft,' and I said, 'Hey, tell me about it.'"

During this conversation a black male walked by the pair. The defendant followed the black male and told P.L. to follow him (the defendant). The defendant went back to his apartment and got the keys to his father's car and invited P.L. into the car. P.L. told the defendant that he was trying to run away from home. The defendant told him he could not be of help except to leave the car unlocked to give P.L. a place to sleep. The defendant exited the vehicle to urinate and returned to the vehicle with his penis still exposed. The defendant testified P.L. asked him why his (the defendant's) penis was "so skinny." The defendant then said, "'What can you do?'" and P.L. performed oral sex on him. P.L. appeared to be scared after having completed this act. P.L. then told the defendant that he wanted to go home. The defendant started the car and drove according to the instructions being provided by P.L.

As the defendant approached the naval base, he saw an empty parking lot, pulled into it and parked, and asked P.L. if he could have sex with him. The defendant testified that his illness had control of him at this time, and he was hearing insulting voices and a lot of

buzzing in his head. The defendant stated that P.L. first rejected defendant's request for sex but then pulled his pants down himself. The defendant testified that he attempted to engage in a sex act with P.L. but P.L. stated it hurt. P.L. pulled the defendant off by "wiggling" off of him. The defendant then took P.L. home.

The defendant acknowledged a second meeting with P.L. in May 1989. The defendant was on Genesee Street when P.L. passed by him. The defendant caught up to him and suggested they go to a place where they could be alone. P.L. said he knew of a better place, so the defendant went with P.L. to a tunnel where P.L. put his mouth on the defendant's penis. The defendant testified he pulled P.L.'s pants down, saw his anus, and asked P.L. a lot of personal questions about who he had been with because he felt there were signs that P.L. had been with somebody.

On cross-examination, the defendant acknowledged having written two letters to his probation officer about P.L. and having made certain entries in a notebook which dealt with the defendant's meetings with P.L. as well as maps designating the locations of P.L.'s parents' home and his foster home.

The defendant remembered speaking with Officer Genell and reviewing a statement prepared by the officer after they talked. The defendant acknowledged that he told Officer Genell during his statement that he should not have touched P.L. because of his age and that he knew it was wrong. The defendant remembered that P.L. told him he was 13 years old during their second meeting.

The defense then rested. After argument concerning whether the defense raised the issue of the affirmative defense of insanity by a preponderance of the evidence, the court ruled it had not and, therefore, that the State was not required to offer additional evidence to establish the defendant's sanity beyond a reasonable doubt. The State rested in rebuttal, and closing comments were presented by both sides. The court entered its finding of guilty but mentally ill as to all four counts of the indictment.

The defendant's post-trial motion was argued and denied. The court sentenced the defendant to a term of eight years in the Illinois Department of Corrections with credit for time served awaiting trial. It did not specify to which conviction or convictions the sentence was applicable. It also agreed to sign a recommendation to the Department of Corrections that the defendant be confined within one of its mental health facilities.

The defendant first contends he was not proved guilty beyond a reasonable doubt of criminal sexual assault where P.L.'s testimony

was not "clear and convincing" or substantially corroborated by other evidence. Defendant's argument is premised on a sex-offense standard of review which is no longer applicable. (See *People v. Schott* (1991), 145 Ill. 2d 188, 202-03; *People v. Yeargan* (1992), 229 Ill. App. 3d 219, 229; *People v. Soler* (1992), 228 Ill. App. 3d 183, 197.) In *Schott*, the supreme court abandoned the "clear and convincing" standard of review traditionally applied to sex-offense cases and replaced it with the usual reasonable doubt standard of review as set forth in *People v. Collins* (1985), 106 Ill. 2d 237. (*People v. Schott*, 145 Ill. 2d at 198-203.) That is, criminal convictions are not overturned on review unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. (*Collins*, 106 Ill. 2d at 261.) The test to be employed on review " 'is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Collins*, 106 Ill. 2d at 261, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.

■■ ■ There is no question that sexual acts occurred. The only issue is whether the evidence was sufficient to show beyond a reasonable doubt that the defendant forced P.L. to engage in acts of oral sex in both May and February thus committing two criminal sexual assault offenses. A person "commits criminal sexual assault if he or she: (1) commits an act of sexual penetration by the use of force or threat of force." (Ill. Rev. Stat. 1989, ch. 38, par. 12—13(a)(1).) In relevant part, " '[s]exual penetration' means any contact, however slight, between the sex organ of one person and the sex organ, mouth or anus of another person." (Ill. Rev. Stat. 1989, ch. 38, par. 12—12(f).) Counts I and III charged that the defendant here committed the offense of criminal sexual assault when, "by the use of force, he placed his penis in the mouth of [P.L.]" in February and in May 1989.

Based on this record, we do not believe that "*any* rational trier of fact" could have found the essential element of force beyond a reasonable doubt. "Force or threat of force" is defined in section 12—12 of the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, par. 12—12(d)) to mean:

"the use of force or violence, or the threat of force or violence, including but not limited to the following situations:

(1) When the accused threatens to use force or violence on the victim or on any other person, and the victim under the circumstances reasonably believed that the accused had the ability to execute that threat; or

(2) when the accused has overcome the victim by use of superior strength or size, physical restraint or physical confinement." Ill. Rev. Stat. 1989, ch. 38, par. 12—12(d).

In its ordinary usage, "force" implies the "exertion of power in causing a person or thing to act, move, or comply against his or its resistance and may refer to physical strength or to any impelling motive." (Webster's New World Dictionary 545 (1972).) There is no definite standard establishing the amount of force which the State is required to prove in order to prove criminal sexual assault, and each case must be considered on its own facts. (*People v. Bolton* (1990), 207 Ill. App. 3d 681, 686; *People v. Nelson* (1986), 148 Ill. App. 3d 811, 820.) In a bench trial, it is the province of the trial court to judge the credibility of the witnesses, to determine the weight to be accorded their testimony, and to draw inferences on their testimony. (*Soler*, 228 Ill. App. 3d at 199; *People v. Foley* (1990), 206 Ill. App. 3d 709, 716.) However, a conviction based upon testimony that is improbable, unconvincing, and contrary to human experience requires reversal. *People v. Ware* (1988), 180 Ill. App. 3d 921.

As noted above, the defendant's argument proceeds from the no-longer relevant premise that, because P.L.'s testimony was not clear and convincing and was not corroborated by any meaningful evidence, the criminal sexual assault offenses had not been proved beyond a reasonable doubt. Although the court recognized the potential for an argument as to the issue of force, it ultimately concluded from having heard the evidence and observed the witnesses "that a boy that age wouldn't need a whole lot of showing of force in order to succumb to the advances made."

The only evidence tending to show that force was applied by the defendant during the two oral sex acts with P.L. was that the defendant placed his hand on the back of P.L.'s head and "forced" P.L.'s head down onto the defendant's penis. Defendant argues that his purported use of force in engaging P.L. in the first oral sex act in February was rendered improbable by the facts that P.L. did not try to leave the car while the defendant was outside urinating; he did not cry out for help; he remained in the car even after the defendant's attempt to achieve anal intercourse; he acknowledged the defendant did not threaten to hurt him, and he believed the defendant had no intent to harm him; he allowed the defendant to drive him to his home; he did not tell anyone about what had happened and he was unable to explain why he was "scared." That the defendant used force on the second occasion in May is also rendered improbable, the defendant argues, by the evidence that, when P.L. encountered the

defendant while he (P.L.) was on his way to McDonald's, P.L. did not seek assistance from any of the other pedestrians present, nor did he continue on to McDonald's in order to avoid the defendant, and it was P.L. himself who suggested the location of the tunnel or viaduct where he and the defendant could talk and the defendant would then leave P.L. alone. Further, after again being forced to engage in acts of oral and anal intercourse while in the viaduct, P.L. sought no assistance from the people who interrupted the act of anal intercourse when they approached the viaduct. P.L. also did not tell anyone what happened until he had a motive to disavow any willing participation therein, that is, not until after the letter left by the defendant at P.L.'s house was discovered by P.L.'s foster family and brought to the attention of the police.

The State argues that the issue of force is a credibility determination and that if circumstances show resistance to be futile or if the victim is overcome by superior strength or that such acts are useless or foolhardy then such acts of resistance are not required.

Although it is true that the law does not require useless acts of resistance (*People v. Bolton* (1990), 207 Ill. App. 3d 681, 686; *In re C.K.M.* (1985), 135 Ill. App. 3d 145, 151), nor is a child expected or required to offer as much resistance as might be expected of an adult (*In re C.K.M.*, 135 Ill. App. 3d at 151), our view of the evidence here, undertaken in the light most favorable to the prosecution, is that not only would an act or acts of resistance not have been foolish or useless, such resistance would probably have been successful. Although P.L. testified he was "scared" of the defendant, he admitted he was not threatened by the defendant nor did the defendant hurt him, except as to the "hurt" P.L. stated he experienced during the anal intercourse. P.L. also testified he believed the defendant did not intend to hurt him.

Relative to the issue of force, a failure to cry out or to resist does not establish consent in sex cases if the victim is threatened or in fear of being harmed. (*People v. Stengel* (1991), 211 Ill. App. 3d 337.) P.L. was neither threatened nor in fear of being harmed by the defendant here.

The State suggests that P.L.'s lack of fear of the defendant does not equate with there being a lack of force in light of the evidence that P.L. tried to fend off the defendant by telling him to stop, by pushing him away and by trying to run away from him. Evidence of P.L.'s resistance to the defendant by "forcing" the defendant off of him and by "wiggling" off of him, related almost exclusively to the two acts of anal intercourse which were the bases for the two aggra-

vated criminal sexual abuse offenses charged in counts II and IV, not the acts of oral sex underlying counts I and III charging criminal sexual assault. P.L. testified the defendant's hand on the back of his head during the oral sex act did not hurt him, whereas he did testify he was hurt by the anal intercourse. Whether the resistance offered during the acts of anal intercourse may have been born more out of P.L.'s desire to terminate the acts rather than to prevent them from occurring in the first place is of no matter here, since force is not an issue in the aggravated criminal sexual abuse charges against the defendant, and he has not challenged his convictions of those offenses.

P.L. did testify he tried to force the defendant off of him during the oral sex act in the viaduct, but the circumstances before and after the act render it highly improbable that P.L. was forced by the defendant to engage in it. It must be remembered that P.L. admitted the defendant did not threaten or otherwise hurt him, nor did he believe the defendant intended to hurt him. Consistent with that, P.L. must have stood by, waiting, while defendant engaged in masturbation and achieved an erection before "forcing" P.L.'s mouth onto the erect penis. After P.L. managed to "push" the defendant off, the defendant went to the other side of the bridge to urinate, but P.L. was able to accomplish a purported escape of only a few more than a couple of steps before the defendant "came running after" him and P.L. stopped. Evidence of P.L.'s behavior belies his testimony that he was forced to engage in the oral sex act.

In sum, we find the evidence that P.L. was forced by the defendant to engage in oral sex on the two occasions charged in counts I and III is so improbable and unsatisfactory as to create a reasonable doubt of the defendant's guilt as to those offenses, and, accordingly, we reverse his convictions and remand the cause for resentencing.

■ Because of the result we reach above, it is unnecessary for us to consider the defendant's remaining contentions concerning the trial court's improper consideration of factors in aggravation at the sentencing hearing. We do agree, however, that the trial court's general eight-year sentence of imprisonment was improper in that it did not specify as to which conviction or convictions it applied. Presumably, since seven years is the maximum sentence for the Class 2 felony offense of aggravated criminal sexual abuse (Ill. Rev. Stat. 1989, ch. 38, pars. 12—16(g), 1005—8—1(a)(5)), the court's eight-year sentence was intended to apply to at least one of the Class 1 felony offenses of criminal sexual assault. Class 1 felonies warrant a sentence of not less than four years and not more than 15 years (Ill. Rev. Stat. 1989, ch. 38, pars. 12—13(b), 1005—8—1(a)(4)). Whatever the court's intent at

the time, our reversal of the defendant's convictions of criminal sexual assault necessitates that the cause must be remanded for resentencing on his remaining convictions of aggravated criminal sexual abuse.

The judgment of the circuit court of Lake County is reversed and the cause remanded.

Reversed and remanded.

GEIGER and NICKELS, JJ., concur.