2021 IL App (2d) 190683-U
No. 2-19-0683
Order filed December 2, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Kendall County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 17-CF-283 |
| | ) | |
| GEBREMEDHIN WOLDENKIDAN, | ) | Honorable |
| | ) | Robert P. Pilmer, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE BRIDGES delivered the judgment of the court.
Justices McLaren and Hutchinson concurred in the judgment.

**ORDER**

¶ 1    *Held*:    There was sufficient evidence to prove defendant guilty of criminal sexual assault beyond a reasonable doubt. Also, the prosecutor's remarks during rebuttal closing argument were not improper. Therefore, we affirm.

¶ 2    Following a jury trial, defendant, Gebremedhin Woldenkidan, was convicted of criminal sexual assault (720 ILCS 5/11-1.20(a)(1) (West 2016)) and criminal sexual abuse (720 ILCS 5/11-1.50(a)(1) (West 2016)). On appeal, he argues that he was not proven guilty beyond a reasonable doubt of criminal sexual assault and that the prosecutor made improper remarks during rebuttal closing argument. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      On October 23, 2017, defendant was charged by indictment with two counts of criminal sexual assault (counts I and II) and two counts of criminal sexual abuse (counts III and IV) for events that occurred on July 15, 2016, with T.G. Count I alleged that defendant committed an act of sexual penetration by the use of force, in that defendant knowingly placed his penis inside T.G.'s sex organ by the use of force. Count II was identical except that it alleged the threat of force rather than the use of force. Count III alleged that defendant committed an act of sexual conduct with T.G. by knowingly touching T.G.'s breast by the use of force for the purposes of defendant's sexual arousal or gratification. Count IV alleged the same facts as count III but alleged the threat of force instead of the use of force.

¶ 5      Defendant filed a motion to suppress statements on August 29, 2018, which the trial court denied on November 16, 2018.

¶ 6      Defendant's jury trial began on May 20, 2019. According to evidence presented by the State, T.G. underwent a hospital forensic examination on the night of July 15, 2016, and vaginal swabs were taken as part of a rape kit. The external examination did not reveal any marks on T.G.'s body or trauma to her vaginal area, and the internal exam revealed no cervical tenderness, meaning that there was no indication of whether any sexual activity was consensual or not. Testing of the vaginal swabs at the Illinois State Police Forensic Lab indicated the presence of semen. A DNA analysis on the swabs was compared to a buccal swab collected from defendant, and the DNA was determined to have come from him, as the chance of the DNA profile was one in 25 decillion people.

¶ 7      Bella Lucas, T.G.'s mother, testified as follows. She was from Mongolia, and in July 2016, she was living in Oswego with her then husband and her two children, T.G. and D.G., who went

by the nicknames "S." and "D." T.G. had seizures her whole life and also suffered from anxiety, which caused her to freeze in stressful situations. T.G. had been seeing doctors for her condition.

¶ 8    Lucas met defendant through her former mother-in-law, who lived in the same retirement housing as defendant in Wheaton. Lucas was looking for someone to help pull weeds from her yard, and her former mother-in-law said that Lucas could hire defendant. When defendant worked for her, Lucas would pick him up in front of his building and drive him to her house. They communicated through body language, and she paid him $10 an hour. The first time he came over, he worked in the yard and then slept over on the couch downstairs. Defendant did more work the next day before Lucas drove him back. At one point, she used T.G.'s phone to call defendant's daughter so that they could discuss what day and time defendant would work next.

¶ 9    On July 15, 2016, Lucas again brought defendant to work in her yard. T.G. came to the kitchen at about 11 a.m. and started cooking. Lucas's husband and D.G. were not at home, and defendant was outside. Lucas left to do some cleaning work and came back about an hour later. She helped defendant in the yard for a while and drove him back to his apartment at 3 or 4 p.m. When Lucas returned home, T.G. said that she wanted to talk to her. Lucas or another family member then contacted the police.

¶ 10    T.G. provided the following testimony. She was 24 years old and in 2016 lived with Lucas, her stepfather, and her younger sister. They also had two dogs. T.G. had epilepsy and anxiety related to her epilepsy. If there was a stressful event, she panicked and froze up.

¶ 11    In the summer of 2016, Lucas hired defendant to do yard work. The first day, he spent the night at their house. T.G. heard him speak in his native language, and he would say some English words like "yes" and "no." When T.G. woke up on July 15, 2016, her family members were in the house, and defendant was doing yard work. Sometime during the morning, T.G.'s stepfather and

sister left the house. T.G. cooked breakfast, and Lucas left shortly before T.G. finished her meal. Defendant was also eating at the kitchen table. T.G. took her plate to the sink to wash it, and defendant followed her with his dishes. T.G. moved out of the way towards the stove. Defendant put his dishes down and walked towards her. She felt scared and picked up her Chihuahua. Defendant pushed her towards the stove with his body, with the dog between them. T.G. noticed that the dog was getting uncomfortable and was scared for it, so she put it down. Defendant then kissed her on the lips and said, "I love you" in English. She tried to move away, but he started grabbing her breast.

¶ 12    T.G. kept saying no and tried walking towards the door to the garage. When she passed by the couch, defendant pushed her onto the couch with his body. T.G. felt scared and confused. T.G. was wearing a skirt, and defendant opened her legs and started grabbing her underwear. He also touched her breast outside her shirt. Defendant then started taking off her underwear. T.G. did not scream or physically resist defendant because she was frightened and froze in the stressful situation. Defendant was standing up, and he took off his pants and underwear and started having intercourse with her by inserting his penis into her vagina. T.G. kept saying no.

¶ 13    The intercourse lasted a couple of minutes, and defendant then put his clothing back on and went outside to resume working. T.G. sat on the couch for five minutes, frozen and trying to understand what happened. She put her underwear back on and went upstairs. She owned a cell phone but did not call Lucas because she did not know where her cell phone was at the time and did not know where Lucas was. She did not run to a neighbor's house, because she wanted her mother. T.G. took a shower and later that evening told Lucas what had transpired. She then spoke to the police and went to the hospital for a medical examination. T.G. denied having ever previously kissed defendant, telling him that she loved him, kissing him, or having consensual sex

with him. On the day in question, she did not tell the detective or the hospital nurse that she suffered from epilepsy and anxiety or that she froze in stressful situations, even though these were an important part of why she did not fight back against defendant. T.G. agreed that defendant was a short, skinny old man. She was 5'3" and 165 pounds.

¶ 14    At the end of July, T.G. went to Mongolia with Lucas for 42 days. When she came back, she saw missed calls and seven voicemails on her phone. She recognized defendant's voice on the messages, and she identified one that was played in open court. The other voicemails were basically the same and said hello, good morning, and how are you, and they referred to her as S.

¶ 15    Officer Anthony Snow of the Oswego Police Department testified as follows. In 2016, he was a general case detective and interviewed T.G. on the night of the incident. On November 1, 2016, Snow went to defendant's apartment to interview him. Defendant was about five feet tall and weighed about 140 pounds. Snow called "Language Line" to be able to use an interpreter to speak to defendant. There were times that Snow asked his question in English and defendant answered without the interpreter's assistance. Snow video recorded the conversation. Snow played a voicemail message from T.G.'s phone for defendant and asked if he had called her, but defendant replied no. Defendant also answered no to the questions of whether he had a job or had been to Oswego. Defendant further denied being a landscaper and knowing someone named T.G. Snow admitted that he had no way of knowing if the interpreter was translating correctly and that he did not use T.G.'s nickname of S. when speaking to defendant that day.

¶ 16    At the close of the State's case, defendant moved for a directed verdict, arguing that the State had failed to prove the element of use of force or threat of force. The trial court denied the motion, stating that reasonable minds could fairly conclude that defendant was guilty.

¶ 17    Defendant then testified as follows. He was 97 years old.[1] He was born in Eritrea and spoke only Tigrinya. Defendant never attended school and could not write; he had farmed for a living. He went to a refugee camp in Ethiopia in 2004 due to war in Eritrea. He had been in the United States for seven years and knew some English words, including "I love you."

¶ 18    In 2016, defendant lived in a senior home in Wheaton. He went to a house to do yardwork and received a total of $190. The lady of the house usually picked him up and took him home, but her husband also took him home once. The second time he went to the house, he met a girl there named S.[2] He spent the night at the house and continued the yard work the next day. That day, T.G. helped him carry the weeds to the garbage. T.G. then kissed him and said "I love you." Defendant was very shocked because this was unexpected, and in Eritrea people kissed each other on the cheeks. Also, defendant was much older than T.G. She then kissed defendant again when he took the cart back to the garage.

¶ 19    The next time defendant came to the house to do yard work, he worked outside and then had lunch with Lucas and T.G. Lucas suddenly left, and defendant and T.G. were alone in the house. T.G. finished eating and took her plate to the kitchen, and defendant took his plate to the kitchen as well. Defendant was drinking water by the sink, and T.G. was by the stove. T.G. then

---

[1] Defendant later testified that he was born on January 1 but did not know what year and therefore did not know his actual age because they did not track age in his native country. At a prior hearing, the trial court stated that defendant's identification stated that he was born in 1941, which would have made him 78 years old at the time of trial.

[2] In his testimony, defendant continued to refer to T.G. as S., but we use the name T.G. for consistency.

hugged and kissed him and said, "I love you." Defendant was separated from his wife and in all of those years he had never had anyone closely touch him or kiss him like that, so he became aroused. Defendant and T.G. walked to the sofa together, holding hands, and sat down. They each took off their underwear and had consensual sex together, with defendant on top. They did not talk to each other while they were having sex. Before T.G. put her underwear back on, defendant went back to the yard, and he did three more hours of work. Defendant never saw a dog in the house. Defendant never pushed T.G., touched her breast, or forced her to have sex with him. She never said no or to stop, and if she had, defendant would not have even gotten close to her. Defendant called T.G. on the phone one time, after about one month, and he left the message that was played in court. He waited that long because she had left the country. Defendant identified his voice in many messages played in court but said that he left only one message. He testified that Lucas may have "multiplied" the message to create many messages.

¶ 20    The jury found defendant guilty of criminal sexual assault and criminal sexual abuse.[3] On June 14, 2019, defendant filed a motion for a new trial in which he included the argument that he was not proven guilty beyond a reasonable doubt. On August 1, 2019, the trial court denied defendant's motion. It then sentenced him to four years' imprisonment on count I and one year imprisonment for count III, to be served consecutively. It found that counts II and IV merged into counts I and III respectively.

¶ 21    This timely appeal followed.

¶ 22                                    II. ANALYSIS

---

[3] The jury instructions included the proposition that the acts were committed by force or threat of force, without separating them as the charges had.

¶ 23                          A. Sufficiency of the Evidence

¶ 24    Defendant first challenges the sufficiency of the evidence regarding his convictions of counts I and II for criminal sexual assault. Count I alleged that defendant committed an act of sexual penetration by the use of force, in that defendant knowingly placed his penis inside the sex organ of T.G. by the use of force. Count II alleged that defendant did so by the threat of force. Defendant argues that the State failed to prove the requisite force or threat of force, and thus failed to prove him guilty of criminal sexual assault. Defendant argues that this issue should be reviewed *de novo* because it involves the purely legal question of whether the State's evidence was sufficient to establish the element of force or threat of force. See *People v. Smith*, 191 Ill. 2d 408, 411 (2000) (applying *de novo* review in construing the meaning of the phrase "otherwise armed" to determine whether the defendant had committed the offense of armed violence).

¶ 25    Defendant points out that "force or threat of force" is defined as:

"the use of force or violence or the threat of force or violence, including, but not limited to, the following situations:

(1) when the accused threatens to use force or violence on the victim or on any other person, and the victim under the circumstances reasonably believes that the accused has the ability to execute that threat; or

(2) when the accused overcomes the victim by use of superior strength or size, physical restraint, or physical confinement." 720 ILCS 5/11-0.1 (West 2016).

Defendant cites *People v. Denbo*, 372 Ill. App. 3d 994, 1005 (2007), where the court stated that "force" does not mean the force inherent to all sexual penetration, but rather physical compulsion or a threat of physical compulsion that causes the victim to submit to the sexual penetration against his or her will. Defendant also notes that a conviction requiring use of force "cannot be sustained

by establishing merely that the victim did not consent." *People v. Mpulamasaka*, 2016 IL App (2d) 130703, ¶ 74.

¶ 26    Defendant argues as follows. For count I, the State relied heavily on T.G.'s statement that defendant pushed her onto the couch to show the use of force element. However, defendant was elderly, five feet tall, and weighed 140 pounds. In contrast, T.G. was 25 pounds heavier and three inches taller. T.G. testified that she remained sitting on the couch while defendant was standing and using his hands to undo his pants and take off his underwear. She was in her own house, knew where the doors were, and had a cell phone, but she never attempted to leave the couch or resist defendant. T.G. stayed in the house after the intercourse, even though defendant remained and worked for another several hours. Further, her physical exams did not show any signs of external or internal harm.

¶ 27    Defendant analogizes this case to *People v. Vasquez*, 233 Ill. App. 3d 517 (1992). There, the 13-year-old complainant, P.L., testified that the defendant forced him to engage in two oral sex acts on different dates by placing his hand on the back of P.L.'s head and forcing it down onto the defendant's penis. *Id.* at 520-1. The first incident happened after P.L. got into the defendant's vehicle, but the defendant then exited the car to urinate, and P.L. did not try to leave and later allowed the defendant to drive him home. P.L. did not tell anyone what happened. *Id.* at 520. P.L. saw the defendant about two months later while P.L. was on his way to McDonald's. The defendant tried to engage P.L. in conversation, and P.L. decided to walk towards the lake instead of McDonald's. *Id.* at 520-21. P.L. then went with the defendant into a viaduct under a bridge, where the second act took place. The defendant again left to urinate, but P.L. did not try to leave at that time, and he did not say anything to people passing by or report the incident later. *Id.* at 521. P.L. testified that he was scared of the defendant, but he admitted that the defendant did not threaten

him and that he also believed that the defendant did not intend to harm him. *Id.* at 528. The incidents apparently came to light after the defendant mentioned them in letters to his probation officer. *Id.* at 519-520, 523. This court found that there was insufficient evidence that the defendant forced P.L. to engage in oral sex, and we reversed his two convictions of criminal sexual assault. *Id.* at 529.

¶ 28    Defendant contrasts *Vasquez* to *People v. Satterfield*, 195 Ill. App. 3d 1087, 1091-92 (1990), where the defendant was convicted of criminal sexual abuse after the complainant testified that, while she was sitting in a car, the defendant opened the car door, grabbed the skin of her neck and shook it, and poked her in the breast. We concluded that there was sufficient evidence of use of force, as the complainant was virtually pinned in the car and was therefore physically confined within the statute's meaning. *Id.* at 1097.

¶ 29    Defendant argues that the instant case is even more compelling than *Vasquez* because T.G. alleged only a push onto the couch. Defendant maintains that although T.G. testified that she was scared, as in *Vasquez*, she did not say that defendant had threatened her, hit her, or confined her. Defendant argues that similar to P.L., T.G. did not physically resist, and she also did not get up from the couch or attempt to leave. Defendant highlights her testimony that even after the intercourse, T.G. stayed home without calling anyone on her phone or seeking assistance. Defendant argues that this case is distinguishable from *Satterfield* because there was no allegation that he confined or pinned her within a confined space, or physically prevented her from leaving. Defendant asserts that although the State used T.G.'s testimony that she had anxiety to explain her failure to resist or leave, this anxiety was personal to T.G. and was not the result of defendant confining her or using force. Defendant argues that force cannot be invented simply due to T.G.'s failure to get up and leave.

¶ 30    Defendant additionally argues that the State failed to prove count II beyond a reasonable doubt because no threats were alleged to have been communicated to T.G. Defendant cites *People v. Giraud*, 2012 IL 113116, ¶¶ 14-15, where the court stated that a threat, "by its very nature," must be communicated to the victim "by word or deed."

¶ 31    In response, the State argues that defendant has not challenged the evidence that T.G. did not consent, but rather relies solely on the element of force. The State asserts that defendant's argument ignores that T.G. had just been sexually abused in the kitchen and demonstrated physical resistance by trying to flee the situation when defendant again assaulted her. The State maintains that defendant prevented her escape and used actual force by pushing her onto the couch. The State asserts that T.G. would not have been sexually assaulted but for defendant pushing her onto the couch, such that the element of force was satisfied. The State maintains that *Vasquez* is distinguishable because there the court found that no rational trier of fact could have found that the element of force was proven beyond a reasonable doubt because the case's facts contradicted P.L.'s testimony that he was forced to engage in the oral sex act. The State argues that unlike in *Vasquez*, T.G.'s behavior does not cast doubt on her testimony, as she explained that her anxiety caused her to freeze in stressful situations. The State contends that it is also reasonable to infer that after just having been sexually assaulted by defendant, T.G. was in fear of being harmed by defendant and submitted to the assault after being pushed onto the couch, such that the purported force in this case was not rendered improbable by the facts.

¶ 32    The State additionally argues that we lack jurisdiction to consider defendants argument that the evidence did not support a conviction on count II for the offense of criminal sexual assault by the threat of force, where count II merged with count I, and no sentence was imposed on count II. The State cites *People v. Betance-Lopez*, 2015 IL App (2d) 130521, ¶ 61, where the court stated

that the "effect of a trial court merging one conviction into another conviction is vacatur of the merged conviction."

¶ 33    We disagree with defendant that *de novo* review is appropriate here, as unlike *Smith*, we are not construing the meaning of a statute as it applies to undisputed facts. Resolution of defendant's argument does not rely on statutory interpretation, and defendant further contests facts in challenging T.G.'s credibility by questioning her version of events. We therefore use the typical standard of review for this issue. When examining the sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Collins*, 106 Ill. 2d 237, 261 (1985). The trier of fact has the responsibility to assess witnesses' credibility, weigh their testimony, resolve inconsistencies and conflicts in the evidence, and draw reasonable inferences from the evidence. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). We will not reverse a criminal conviction based on insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Murray*, 2019 IL 123289, ¶ 19.

¶ 34    As charged in count I, a person commits criminal sexual assault if he commits an act of sexual penetration and uses force. (720 ILCS 5/11-1.20(a)(1) (West 2016)). We agree with the State that the element of force was satisfied here by T.G.'s testimony that defendant pushed her onto the couch. Notably, T.G. had just been sexually abused by defendant in the kitchen and was trying to get away from him by walking towards the door to the garage. Defendant prevented T.G. from leaving by pushing her onto the couch, and he then removed her underwear, took off his pants and underwear, and had intercourse with her. But for defendant's push, T.G. would have left the

house. It is true that T.G. was younger, taller, and heavier than defendant, but his act of pushing her onto the couch was still a use of force against her. T.G.'s testimony was not incredible, unlike in *Vasquez*, because she explained her failure to physically resist or fight back by testifying that she had anxiety issues and would freeze in stressful situations. Also in contrast to *Vasquez*, where the complainant did not come forward on his own, T.G. told her mother about defendant's conduct the same day. Accordingly, there was sufficient evidence to prove defendant guilty beyond a reasonable doubt of criminal sexual assault.

¶ 35    We further agree with the State that because the trial court merged defendant's conviction of count II into his conviction of count I, count II was vacated. *Betance-Lopez*, 2015 IL App (2d) 130521, ¶ 61. We therefore lack jurisdiction over count II and do not address the sufficiency of the evidence on that count. See *People v. Olaska*, 2017 IL App (2d) 150567, ¶ 113.

¶ 36                                  B. Rebuttal Closing Argument

¶ 37    Defendant next argues that the individual and cumulative effects of improper comments made by the State in rebuttal closing argument constitute plain error and require reversal. Defendant first cites the following portion of the State's rebuttal closing argument:

> [State:] "So when counsel says this case comes down to consent, it shouldn't be a mystery why it comes down to consent.
>
> What are the potential defenses to these charges. I wasn't there. Well, we know that one's not gonna fly. [T.G.] said she was there, he was there, [Lucas] said he was there. There is [*sic*] other people in the house. He can't say I wasn't there. That's not going to work. Okay. Let's try this one—
>
> [Defense Counsel]: I would object to the characterization of my closing argument.
>
> THE COURT: Well, your objection is noted but you can continue ***.

[State]: Thank you. Let's try, okay, I was there but I didn't have sex with her. We'll try that one.

Now, we know that one's not gonna fly. One in 25 decillion people have the genetic profile that was contained on the male portion of the vaginal swab from [T.G.'s] body. Not gonna work.

Of course, the defense is now going to be consent. What's left?"

Defense counsel then objected again, and the trial court overruled the objection.

¶ 38    Defendant also contests the following subsequent remarks by the State:

"Now, today *by your verdict, you can give her the respect that she deserves*. You can *let this defendant know* I don't care how much you loved this girl you just met, I don't care how much you can't control yourself because you've been away from your wife for so many years, you can't take advantage of [T.G.]. It's not your right, it's not correct. Until you see that green light, yes means yes. There was no consent. You *can honor that word no, show [T.G.] the respect she deserves*, find this defendant guilty of criminal sexual abuse and criminal sexual assault." (Emphases added.)

¶ 39    Defendant did not object to the second paragraph of remarks, nor did he include the broader issue of improper closing argument in his motion for a new trial, thus forfeiting this argument for review. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). However, defendant asks that we review the remarks for plain error. The plain error doctrine allows a reviewing court to consider an unpreserved error where either (1) a clear error occurs and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, or (2) a clear error occurs that is so serious that it affected the trial's fairness and challenged the integrity of the judicial process. *People v. Sebby*, 2017 IL 119445, ¶ 48. Defendant argues that this case is

reviewable under the first prong, as the entire case turned on witness credibility and the evidence was closely balanced, such that the improper and prejudicial remarks require reversal. The first step in a plain error analysis is to determine whether a clear or obvious error occurred. *People v. Jackson*, 2021 IL App (1st) 180672, ¶ 21.

¶ 40    For the first group of remarks, defendant argues that the State was disparaging him and his counsel and suggesting that they came up with a defense through the process of elimination, which was tantamount to suggesting that the defense fabricated its theory of the case in a calculated and disingenuous way. Defendant cites *People v. Aguirre*, 291 Ill. App. 3d 1028, 1035 (1997), where this court stated, "It is blatantly improper to suggest that the defense is fabricated, as such accusations serve no purpose other than to prejudice the jury." See also *People v. Johnson*, 208 Ill. 2d 53, 82 (2003) ("Unless predicated on evidence that defense counsel behaved unethically, it is improper for a prosecutor to accuse defense counsel of attempting to create reasonable doubt by confusion, misrepresentation, or deception."). Defendant analogizes this case to several others that were reversed for a new trial: *People v. Kidd*, 147 Ill. 2d 510, 541 (1992) (prosecutor stated that the defense strategy was to create as many side issues and confusion as possible to divert the jury from the real facts and the real issues); *People v. Polenik*, 407 Ill. 337, 348-49 (1950) (prosecutor made repeated references to criminal lawyers in a manner calculated to arouse general prejudices, such as saying that defense lawyers "concoct these defenses"); *People v. Monroe*, 66 Ill. 2d 317, 324 (1997) (prosecutor's accusation of fraud by defense counsel could serve only to arouse the antagonism of the jury); *People v. Lee*, 128 Ill. App. 3d 774, 782-83 (1984) (the prosecution called the defendant a con man for not requesting psychiatric help until after his arrest when he had counsel, and repeatedly labeled him as a liar). Defendant argues that there was no indication that

his attorney did anything other than present his defense to the jury, such that the State's comments were an unwarranted, prejudicial attack on the defense.

¶ 41    The State argues that the focus of the parties' closing argument was on the issue of consent, and in its rebuttal closing argument, the State emphasized this issue by pointing out that defendant was at the residence with T.G. at the time of the offense and that the DNA evidence conclusively established that defendant had sexual intercourse with T.G. The State maintains that the remarks can also be seen as commenting on the credibility of defendant's version of evidence. See *People v. Rebecca*, 2012 IL App (2d) 091259, ¶ 82 (the State may comment on the evidence and all reasonable inferences from the evidence).

¶ 42    The State contends that even if the remarks could be considered improper, they are not reversible error because they comprised only a small part of the rebuttal, wherein the State repeatedly emphasized that the real issue in the case was consent. See *id.* (improper remarks warrant reversal only where they result in substantial prejudice to the defendant); *People v. Nicholas*, 218 Ill. 2d 104, 122 (2005) (improper remarks would not constitute plain error because they were brief, made at the beginning of argument, and not repeated). The State argues that they did not impact defendant's right to a fair and impartial trial, because they merely reinforced that consent was the ultimate issue of the case. The State also points out that the trial court admonished the jury that closing arguments were not evidence and that the jury should not consider any argument not based on the evidence. See *id.* (citing such admonishments in its analysis that improper remarks did not rise to the level of plain error).

¶ 43    Prosecutors generally have wide latitude in the content of their closing arguments and may comment on the evidence and any fair and reasonable inference from the evidence, even if the inference reflects negatively on the defendant. *People v. Jackson*, 2020 IL 124112, ¶ 82. A

prosecutor may also respond to statements by defense counsel that invite a response but must refrain from making improper, prejudicial comments and arguments. *People v. James*, 2021 IL App (1st) 180509, ¶ 39. We view the challenged remarks in the context of the closing argument as a whole. *Jackson*, 2020 IL 124112, ¶ 82. Improper remarks constitute reversible error only if they result in substantial prejudice to the defendant, such that absent the remarks, the verdict would have been different. *People v. Branch*, 2018 IL App (1st) 150026, ¶ 32. Our supreme court has applied both the *de novo* (*People v. Wheeler*, 226 Ill. 2d 92, 121 (2007)) and abuse of discretion standard of review (*People v. Blue*, 189 Ill. 2d 99, 128 (2000)) for the trial court's rulings on closing argument. We need not attempt to select one standard because we are ultimately reviewing this issue for plain error. See also *Jackson*, 2020 IL 124112, ¶ 82 ("The standard of review applied to a prosecutor's closing argument is similar to the standard used in deciding whether a prosecutor committed plain error," in that we "will find reversible error only if the defendant demonstrates that the remarks were improper and that they were so prejudicial that real justice was denied or the verdict resulted from the error.").

¶ 44    We conclude that although the prosecutor's remarks could have been stated more artfully, they were a proper comment on the evidence. Notably, Snow testified that when he interviewed defendant, defendant denied even being in Oswego, being a landscaper, knowing T.G., or leaving the voicemail message played from T.G.'s phone. However, based on the scientific evidence that his semen was found inside T.G., at trial he could no longer deny knowing her, having been to her house, or having intercourse with her, which left the defense of consent. Both parties highlighted that consent was the central issue, so the prosecutor's remarks did not cause any confusion and, unlike the cases that defendant cites, did not directly or personally attack defense counsel.

¶ 45    Regarding the second group of remarks, defendant argues that it was error for the prosecutor to appeal to the jurors' sympathies by asking them to send a message to the defendant and "honor" the complainant by showing her "the respect that she deserves" through their verdict. Defendant cites *People v. Hayes*, 353 Ill. App. 3d 578, 586 (2004), where the court stated that "sending messages, whether to the defendant, to the police or to society, is not the jury's job" and that it "is wrong to imply that the guilty verdict form may be used for any purpose other than a finding that all elements of the offense were proved beyond a reasonable doubt." *Id.* at 586. Defendant also cites *People v. Wheeler*, 226 Ill. 2d 92, 129 (2007), where the court stated that it is improper for a prosecutor to use closing argument to forge an us-versus-them mentality that is inconsistent with the jury's nonpartisan role. Defendant argues that the prosecutor's statement that the jury should give T.G. the respect that she deserved and "let this defendant know" that his actions were wrong, were likewise improper and designed to inflame the jury's passions and create an "us against them" atmosphere. Defendant argues that the jury's sole role was to determine whether all of the charges' elements were proven beyond a reasonable doubt, and its job was not to send a message, to "let the defendant know," or to use its verdict to show the victim respect.

¶ 46    The State argues that the comments were properly based on the evidence and were not meant to inflame the jury's passions. The State highlights T.G.'s testimony that she told defendant "no" when he grabbed her breast and sexually assaulted her, but defendant ignored her words. The State also argues that the prosecutor did not say to send defendant a message or send him back to jail, and it notes that under *People v. Harris*, 129 Ill. 2d 123,159 (1989), it is permissible for a prosecutor to dwell upon the evil results of crime and to urge the fearless administration of the law. The State maintains that even if we find that error exists, defendant cannot establish substantial prejudice.

¶ 47 We conclude that the prosecutor's statement to "let the defendant know" was not in error because the State did not improperly exhort the jury to "send a message" against criminal behavior to the larger community by convicting defendant. Instead, the prosecutor tied the phrase to convicting defendant based on the evidence presented against him. *Cf. People v. Desantiago*, 365 Ill. App. 3d 855, 865 (2006) (the State's remarks encouraged the jury to send a message to the defendant rather than the community at large). Similarly, the prosecutor's statements to show T.G. the respect that she deserved by convicting defendant was directly linked to T.G.'s saying no and her lack of consent to defendant's actions. For these reasons, this is distinguishable from *Wheeler*, where the prosecutor sought to "inflame the passions and prejudices of the jury, uniting the interests of the jurors in their own safety with that of the interests of the State in convicting [the] defendant." *Wheeler*, 226 Ill. 2d at 130-31.

¶ 48 To the extent that the remarks can be considered prosecutorial exhortations, "limited prosecutorial exhortations are proper where it is made clear to the jury that its ability to effect general and specific deterrence is dependent solely upon its careful considerations of the specific facts and issues before it." *People v. Johnson*, 208 Ill. 2d 53, 79 (2003). Here, the disputed statements were limited in scope and directed the jury to the specific facts and issues in this case, including the primary issue of whether T.G. consented to the intercourse.

¶ 49 As we have found no error in the prosecutor's remarks, there can be no plain error. We also need not address defendant's argument that the cumulative effect of the prosecutor's improper remarks prejudiced him.

¶ 50                                     III. CONCLUSION

¶ 51 For the reasons stated, we affirm the judgment of the circuit court of Kendall County.

¶ 52 Affirmed.