2025 IL App (4th) 241510-U

NO. 4-241510

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

FILED
October 30, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Livingston County |
| JOSE A. GAMBOA, | ) | No. 21CF66 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jennifer H. Bauknecht, |
| | ) | Judge Presiding. |

JUSTICE GRISCHOW delivered the judgment of the court.
Justices Steigmann and Zenoff concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The appellate court concluded (1) defendant was proven guilty beyond a
reasonable doubt of criminal sexual assault, (2) the trial court properly admitted
the victim's testimony of prior alleged instances of sexual assault perpetrated by
defendant, (3) defendant was provided effective assistance of counsel, and
(4) defendant's sentence was not excessive. However, defendant's conviction for
criminal sexual assault and sexual relations within families violated the one-act,
once-crime rule; therefore, his conviction and sentence for sexual relations within
families was vacated.

¶ 2     Following a bench trial, defendant, Jose A. Gamboa, was convicted of criminal

sexual assault (720 ILCS 5/11-1.20(a)(1) (West 2020)) and sexual relations within families (*id.*

§ 11-11(a)) and sentenced to terms of 12 years and 5 years in prison, to be served concurrently.

On appeal, defendant contends (1) the State failed to prove him guilty beyond a reasonable doubt

of criminal sexual assault because there was no evidence that he used or threatened force, (2) the

trial court improperly admitted the victim's testimony of prior alleged instances of sexual assault

perpetrated by defendant, (3) his counsel was ineffective for failing to present evidence of his acquittal of a prior criminal sexual abuse charge involving the same victim, (4) his conviction violates the one act, one crime doctrine, and (5) his sentence was excessive. We affirm in part and vacate in part.

¶ 3                                    I. BACKGROUND

¶ 4                                   A. The Charges

¶ 5        In March 2021, defendant was charged by information with two counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(1) (West 2020) (count I); 720 ILCS 5/11-1.20(a)(3) (West 2018) (count II)) and two counts of sexual relations within families (720 ILCS 5/11-11(a) (West 2020) (count III); 720 ILCS 5/11-11(a) (West 2018) (count IV)) for alleged criminal conduct perpetrated against M.G., defendant's biological granddaughter, whom he adopted as his daughter when she was four years old. The criminal sexual assault charges alleged that on or about March 29, 2021 (count I) and May 5, 2019 (count II), defendant committed an act of sexual penetration with M.G. through force or threat of force by placing his penis in her vagina. The sexual relations within families charges stated that on or about March 29, 2021 (count III) and May 5, 2019 (count IV), defendant, who is related to M.G. as her adoptive father and grandfather, knowingly committed an act of sexual penetration with M.G., who was at least 18 years of age at the time the act was committed, by placing his penis in M.G.'s vagina.

¶ 6        Defendant filed a motion to sever the counts based on the two separate incidents alleged in the information. The State did not object to severance but filed a motion pursuant to section 115-7.3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.3 (West 2022)) stating its intent to seek admission of evidence regarding both alleged incidents as to all counts when brought to trial as other-crimes evidence to show defendant's propensity to commit

sex offenses. Thereafter, the State elected to proceed with counts I and III only, and defendant waived his right to a jury trial. Counts II and IV were later dismissed during posttrial proceedings. Prior to trial, the trial court granted the State's motion to admit other-crimes evidence pursuant to section 115-7.3 of the Code.

¶ 7                                    B. The Trial

¶ 8          The case proceeded to a bench trial that took place over three separate days: May 31, 2023, August 24, 2023, and January 26, 2024. The following is a summary of the evidence presented at trial.

¶ 9                              1. *The State's Case*

¶ 10          M.G. (born March 2001) testified that she was 22 years old and defendant was her maternal grandfather. Defendant and his wife, Roberta, adopted M.G. and her younger siblings when she was four years old. M.G. stated defendant and Roberta divorced when she was in elementary school, after which she lived with Roberta and had visits with defendant. Visitation with defendant stopped when she was 12 years old because of an order of protection, which prevented her from having contact with defendant for a period of time. M.G. stated when she was 16 years old, she reached out to defendant to reconnect with him, despite Roberta being opposed to it. M.G. explained she wanted to reconnect because defendant was her father and had "always been there" for her. She also explained Roberta physically abused her and that the abuse continued until Roberta kicked M.G. out of the home when she turned 18 years old in March 2019. Because M.G. had no place to go, she contacted defendant and moved into his apartment.

¶ 11          M.G. testified, on May 5, 2019, she reported to the police defendant had sexually assaulted her in his apartment. M.G. explained defendant had sexual intercourse with her, but she did not remember the details. After it happened, she called her pastor. Her pastor arranged to

- 3 -

meet M.G. at a nearby Dairy Queen because M.G. did not want him to come to the apartment with defendant there. Her pastor took M.G. to the police station, where M.G. gave a statement and was taken to the hospital for a sexual assault kit examination. That evening, M.G. stayed with her biological mother. Thereafter, M.G. briefly stayed with Roberta and at a homeless shelter, which she found frightening. In September 2019, M.G. made the decision to move back in with defendant because she had nowhere else to go and did not believe defendant would abuse her again. M.G. explained she thought she "did something wrong or something to cause the sexual abuse that happened." M.G. stated she had never had sexual intercourse before defendant sexually abused her when she turned 18.

¶ 12 M.G. stated defendant began sexually abusing her again right after she moved back to his apartment, but she did not report it. Defense counsel objected to questioning regarding acts of sexual abuse other than the May 5, 2019, incident and the March 29, 2021, incident. Defense counsel argued under section 115-7.3(d) of the Code, the State was obligated to disclose this evidence prior to trial, no good cause was shown as to why it was not disclosed, and the evidence was "wholly prejudicial." The State argued it was not seeking the admission of the testimony pursuant to section 115-7.3. Instead, the State argued M.G. should be allowed to testify about other incidents of abuse to explain why she did not report the abuse right away. The State elaborated M.G. should be allowed to explain "the entirety of her relationship with the Defendant and the entirety of the abuse that he perpetrated on her" and the establishment of "the familiarity between the witness and the Defendant as well as the fact corroborating the witness's statements regarding the incidents that are charged." The trial court took a short recess to consider the issue and subsequently ruled that the evidence was admissible "per case law insofar as it goes to establish the relationship of the parties, degree of familiarity, etcetera."

¶ 13        M.G. stated when the abuse started again, she did not report it right away or move out because she "had nowhere to go live and [she] had no money to have somewhere to go or have anything." M.G. stated she did not want defendant to do "those things" to her, but she was "afraid of being homeless again." Later, on cross-examination, M.G. was asked about the other alleged incidents of abuse that took place between May 2019 and March 2021. She stated there were "a lot" of incidents and they "were all having intercourse," but she had "blocked" the details. M.G. also acknowledged defendant provided for her and paid for her housing and meals because she did not have a job. M.G. stated she finally reported the abuse again after an incident on March 29, 2021.

¶ 14        M.G. testified on March 29, 2021, she and defendant ordered takeout for dinner. After dinner, defendant started "teasing" M.G. with a fork by poking her with it. M.G. approached defendant, who was sitting in his recliner, to give him a kiss on the forehead as she went to bed. M.G. stated she did so nearly every night. M.G. walked to her bedroom, and defendant followed her. Defendant stood in the doorway, removed his clothes and placed a condom wrapper on the television stand. Defendant approached M.G., having put the condom on, and told her to remove her underwear. M.G. stated she did so, "[b]ecause I felt like I was being, like I couldn't say no." Defendant got on top of her while she was on her bed and had sexual intercourse with her. M.G. stated she was unable to get away because defendant was physically bigger. M.G. stated she did not want defendant to have sex with her and, while it was happening, she was thinking she "couldn't do anything about it" and she "wouldn't be able to get him off" of her. M.G. acknowledged she did not attempt to get away.

¶ 15        M.G. stated that when defendant was done assaulting her, he picked up his clothes and went into the bathroom. She heard the toilet flush and stated this was usually how he

- 5 -

disposed of the condoms. When defendant left her room, she closed her door, turned on music, and "video chatted some people" via Facebook group chat. She explained she did so because she was "super upset" and was crying. She contacted her biological father (in Texas), her sister (in Illinois), and two friends (one in Florida and one in Australia). M.G. stated they told her to call the police, but she did not want to because she "had nowhere to go live and [she] had nothing." M.G. stated her biological father called the police because she refused to do so. M.G. said she was upset about her father calling the police because she was scared and "didn't want to go through all the court stuff." When she knew the police were coming, she stated she stayed in her room and put her nightgown and the condom wrapper in a grocery bag because she knew the police would need them for evidence. M.G. stated she may have placed her underwear in the bag, but she did not remember. When the police arrived, she reported what happened. The police took M.G. to the hospital for a sexual assault examination.

¶ 16 On cross-examination, M.G. acknowledged she sought an order of protection against defendant after the March 29, 2021, incident. In that proceeding, M.G. recalled testifying but admitted that during her testimony she could not recall the details of the incidents attested to in the petition, which took place between March 26 and 29, 2021. M.G. explained she knew what had happened, but she "had the days mixed up." M.G. acknowledged she contacted the police in September 2019 to inform them she did not want to proceed with the prior case (the May 5, 2019, incident) because she did not want to go through the "court stuff." On redirect examination, M.G. explained that she "blocked" the incidents so she did not have to "deal with the pain, the flashbacks, the nightmares." She did not recall the details but stated the incidents would happen "whenever he felt like it" and they occurred in her bedroom, his bedroom, and once in the living room. When asked if defendant held her down, M.G. responded, "With his

- 6 -

weight I felt like he would because he's a lot heavier than me." She stated she did not tell him to stop because she did not know what he would have done, did not want to be homeless again, and was scared he would kick her out. M.G. reiterated she did not want defendant to have sex with her and she would cry when he did so.

¶ 17 Photographs taken by the police were admitted into evidence, including photos of defendant's apartment and the nightgown, underwear, and condom wrapper M.G. had placed in the grocery bag.

¶ 18 Officer Watson McKee of the Dwight Police Department testified that he responded to a call reporting a sexual assault at defendant's apartment on March 29, 2021. His first impression of M.G. was that she was "very quiet, unemotional," and she asked to speak outside the apartment and away from others. M.G. told him defendant entered her bedroom, removed his clothing, got into bed with her, and had sexual intercourse with her using a condom. M.G. told him she had been wearing a nightgown and no underwear. She told him she did not know what happened to the condom. Officer McKee arrested defendant, and another officer took M.G. to the hospital for a sexual assault examination. Officer McKee stated he remained at the scene to assist Detective Gary Beier in collecting evidence. On cross-examination, Officer McKee recalled he wrote in his report that M.G. told him defendant either threw the condom in the trash or flushed it in the toilet.

¶ 19 Detective Beier of the Dwight Police Department testified he also investigated the May 5, 2019, alleged sexual assault. After meeting with M.G., he obtained a search warrant and conducted a search of defendant's apartment. Detective Beier took photographs and recovered evidence, including a bed sheet, four open packs of condoms, and a used condom from the kitchen garbage can. In September 2019, M.G. contacted Detective Beier and informed him she

did not want to pursue the charges against defendant because "she needed a place to stay; and that's where she had to go back was back to [defendant's] place." M.G. did not deny the incident occurred or otherwise recant her statements defendant had sexually assaulted her. Detective Beier stated he was also called to defendant's apartment on March 29, 2021, to investigate another sexual assault. When he arrived, defendant was already in custody and M.G. was about to be taken to the hospital for a sexual assault kit examination. Detective Beier searched the apartment, took photographs, and collected evidence, including a Walmart bag that was on M.G.'s bed, which contained a nightgown, underwear, and a condom wrapper. A dresser drawer in defendant's room contained unopened condoms from the same package as the wrapper collected from the bag in M.G.'s room.

¶ 20 Christina Davis, a registered nurse who was certified as a sexual assault nurse examiner with Riverside Medical Center, testified that she performed a sexual assault examination on M.G. on March 29, 2021. During the examination, Davis observed redness to the cervix, a small amount of blood near the cervix, and a moderate amount of a white substance.

¶ 21 Kelly Krajnik and Heather Wright, forensic scientists with the Illinois State Police crime laboratory, testified as expert witnesses in the field of forensic biology and DNA analysis. Both conducted, tested, and compared numerous swab samples taken in this case. Krajnik testified that with a statistical frequency of 1 in 980 individuals, defendant could not be excluded as a contributor to the male DNA found in the sample taken from M.G.'s left breast on March 29, 2021. A sample taken from M.G.'s right breast on the same day showed male DNA from which defendant could not be excluded as a contributor, with a frequency of one in two people. The sample from M.G.'s vaginal swab did not detect any male DNA. Krajnik explained this would not be unusual if the perpetrator was wearing a condom. Wright identified two DNA

profiles from the outside of the condom police collected from the kitchen garbage can on May 5, 2019, which was part of the investigation into the prior incident. Wright testified that when she conducted her analysis in 2020, M.G. could not be excluded from the "major female profile" found and defendant could not be excluded from the "minor male profile," with a statistical frequency of 1 in 74,000 unrelated individuals. When she conducted an additional analysis of these samples in 2021 using a new chemistry platform, defendant could not be excluded from the minor male profile of the sample from the outside of the condom, which had a statistical frequency of one in 1.7 billion unrelated individuals. Wright testified there were no sperm cells present in the samples.

¶ 22                                2. *Defendant's Case*

¶ 23            After the State rested, defense counsel asked the trial court to take judicial notice of the entire transcript of the April 14, 2021, hearing on the order of protection filed by M.G. against defendant. Defense counsel argued the transcript was admissible under Illinois Rule of Evidence 201(b) (eff. Jan. 1, 2011), arguing M.G.'s prior testimony should have been admissible as impeachment evidence because that proceeding involved the same parties, similar subject matter, and the same county, although it was held before a different judge. The State objected. The court denied admission of the evidence, ruling if defense counsel wished to impeach a witness, "then you have to have a witness on the stand; and it has to be an impeachable event. You can't just tender the entire transcript." No further evidence was presented by the defense.

¶ 24                                3. *The Trial Court's Decision*

¶ 25            After closing arguments were held on January 26, 2024, the trial court found defendant guilty of both counts, criminal sexual assault and sexual relations within families. In concluding the State met its burden of proof, the court found M.G. was a credible witness who

provided "overall" consistent testimony. The court found M.G. to be a "very shy, quiet young lady," who seemed "sad" but also "genuine and sincere with her testimony." The court stated M.G. did not have all the details at times, but through extensive examination, she was given "multiple opportunities throughout the trial to embellish" and did not do so, and the details she did provide were "clear and consistent." The court found M.G.'s testimony was "bolstered" by the other evidence presented in this case, including the physical evidence and the fact that she was not the one who reported the May 2021 incident. The court concluded the State proved defendant committed an act of sexual penetration through force or threat of force upon M.G., who was an adult, his adopted daughter, and his biological granddaughter. The case was set for a sentencing hearing on March 21, 2024.

¶ 26                              C. Posttrial Proceedings

¶ 27                              1. *Motion for a New Trial*

¶ 28        Defendant filed a motion seeking to substitute his trial counsel with a new attorney of record, Maureen Williams. On February 29, 2024, defendant's motion for substitute counsel was granted. His new attorney filed a motion for a new trial, stating, in two brief sentences, defendant's claims: (1) defendant was denied effective assistance of counsel and (2) "[i]nsufficient evidence existed to convict Defendant of criminal sexual assault." After several continuances, the matter was set for a hearing on July 29, 2024.

¶ 29        On the day of the hearing, posttrial counsel filed a memorandum in support of the motion for a new trial and stated she had e-mailed it to both the State and the trial court. The State acknowledged its receipt of the memorandum via e-mail approximately an hour before the hearing, and the court stated it had not seen the memorandum. The State objected to certain attachments filed with the memorandum as hearsay.

- 10 -

¶ 30　　　　In the memorandum, defendant's posttrial counsel argued trial counsel was ineffective for failing to "introduce *** evidence that could have given the trial court pause in making its determination of guilt" and the court was "prevented from knowing material information that exonerates [defendant]." In support, posttrial counsel included (1) a partial transcript from a hearing held in 2016 in a case involving M.G., as a minor, and defendant wherein the same trial judge issued her ruling and found defendant not guilty of child sexual abuse; (2) the complete transcript of an order of protection hearing held in 2021 involving these parties that included M.G.'s testimony and the court's determination the evidence was insufficient to support entry of an order of protection; (3) M.G.'s 2021 hospital records from her sexual assault examination, including diagrams, a photo of M.G., and M.G.'s statements made to health care providers; and (4) an affidavit of Douglas Litwiller, the owner of an apartment complex, attesting defendant was the facility manager of his property and while defendant was in jail, he learned from tenants of certain conduct of M.G., including that she had knocked on their doors and attempted to collect rent payments. Posttrial counsel also stated trial counsel was ineffective for failing to question the process by which evidence was collected from defendant's apartment or the reliability of the laboratory results in the case.

¶ 31　　　　Extensive discussion was held in open court regarding whether defendant was entitled to an evidentiary hearing on the motion for a new trial based on ineffective assistance of trial counsel. After concluding an evidentiary hearing was not warranted, the trial court heard argument on defendant's motion for a new trial.

¶ 32　　　　The trial court denied defendant's motion for a new trial, finding much of what was argued in support of the motion was about trial strategy—what could have been done or argued at trial. The court noted some of the issues raised were argued at trial, including the

reliability of the evidence. Therefore, the court found no merit to the claim of ineffective assistance of counsel, concluding,

> "More importantly, there is nothing that's been argued that would overcome the very strong presumption that all the decisions made by trial counsel in connection with questions that were asked on direct and cross [examination], evidence that he tried to admit, evidence that he did admit, evidence that he chose not to admit were all the result of sound trial strategy."

¶ 33            2. *Sentencing Hearing*

¶ 34            Upon the denial of defendant's motion for a new trial, the case proceeded to sentencing. The State submitted to the trial court the presentence investigation report (PSI) and had M.G.'s victim-impact statement read to the court. In her statement, M.G. explained she moved in with defendant to have a safe place to gain independence so she could be ready to live on her own, but it did not turn out that way because he began to abuse her again. M.G. acknowledged she struggled with depression, anxiety, flashbacks, nightmares, and  trusting people. She hoped to get her life together for her family but stated she would always struggle with this trauma and it will affect her life until she heals.

¶ 35            Defendant called two witnesses to testify on his behalf. Litwiller stated defendant lived in the apartment building he owned and served as the facility manager. He mentioned that defendant had worked for him for 12 to 13 years, described him as reliable, and said he would trust him with his life. He added that if defendant had a flaw, it would be his tendency to allow others to take advantage of him. Litwiller was not aware that M.G. lived with defendant until after his arrest. Jill Mann, defendant's fiancée, testified that she met defendant while at work at a bank where he was a customer. She had known him since 2010, and they became engaged in

2019. She described defendant as "incredibly kindhearted[ and] generous." She agreed numerous people had taken advantage of him because of his demeanor. She added she had never heard him raise his voice, stating he was "passive, easy going, [and] would do anything for anybody." Mann admitted she had never met M.G., although defendant spoke to her about his grandchildren and expressed concern about M.G. not having a driver's license at age 18 and wanting her to "better herself." She recalled overhearing a phone conversation between defendant and M.G. wherein defendant encouraged M.G. to get a job at the Dairy Queen next door, but M.G. was upset and replied she did not want to work with "a bunch of 16 year olds."

¶ 36    Defendant testified he had adopted M.G. and her three younger siblings because their birth mother was abusing them. He acknowledged M.G. had accused him of sexual abuse in 2014, but he denied the accusations and was acquitted in that case in 2016. M.G. did not live with him again until he allowed her to move back in with him when she turned 18. Defendant stated he did so, against the advice of his attorney and friends, because he did not want to turn his back on her and believed "[s]he wouldn't stand a chance out there." Defendant explained he expected M.G. to stop harming herself, "no longer try to commit suicide," get her driver's license, and go to school. Defendant worked with M.G. to study for a "placement test" to be allowed to take classes at a junior college, but she failed the test three times. Defendant then encouraged M.G. to get a job. Defendant denied ever sexually abusing M.G. and stated he did not regret allowing her to move back in because he could not abandon his child. Though she expressed a desire to seek mental health help, she did not pursue it. Defendant stated once released, he would be sure there was always a witness to his conversations with M.G. and he would never be alone with her ever again.

¶ 37 The State recommended a sentence of 12 years in prison on count I, to run concurrently with a 5 year sentence on count III. The State argued that defendant segregated M.G. from others, noting neither witness defendant presented in mitigation had ever met M.G., despite being very close to him. The State argued M.G. felt she had nowhere else to go and was struggling, defendant knew this, and defendant took advantage of her.

¶ 38 In response, defense counsel argued for "the minimum" sentence. Defense counsel disputed defendant controlled M.G. and stated, "[A]nyone that would move in with a person that they claimed raped them over 20 times should, it should be looked at seriously to say this woman is not credible." Defense counsel argued M.G. could not "keep her stories straight" and said, again, "[W]ho would move in with a rapist, you would think that of all the people in the world that you would least want to move in with let alone sit across the table from is a rapist; and yet this is what she's done." Defense counsel stated, again,

> "By claiming rape when it did not occur, and I'm sorry if I offend anybody, but this did not occur; and for this woman to say that it occurred when it didn't, it just, it's the reason why rape victims who actually are victims don't want to come forward; and it's the reason why I have never seen a trial where I did not see the State introduce the hospital report, record."

The State objected when defense counsel then contended the "lab report should have been thrown out" and M.G.'s "motive should have been dug into." The trial court sustained the objection, stating there was no evidence to support her argument and reminding defense counsel she was supposed to be presenting argument regarding sentencing.

¶ 39 In his statement in allocution, defendant said he tried to do the best for M.G. and protect her from danger. M.G. chose to stay in the apartment "at all times" and "[h]ardly

anybody saw her because she was always in her room." He asserted she could leave anytime she wanted. Defendant stated, "I don't know what I did wrong. I thought I did the right thing protecting my child."

¶ 40 Accepting the State's recommendation, the trial court sentenced defendant to concurrent terms of 12 years and 5 years in prison, respectively, for criminal sexual assault and sexual relations within families. In explaining its decision, the court deemed it "important at this juncture for the Court to reiterate a few things about the trial in this case" and summarized the timeline of the evidence presented at trial, reiterating the evidence was "very strong beyond a reasonable doubt." The court stated it considered the evidence, including the PSI, and the factors in aggravation and mitigation. The court emphasized the serious harm caused by defendant's conduct, the fact it took a lot of courage for M.G. to come forward under the circumstances, and the necessity for deterrence. In mitigation, the court noted defendant's lack of criminal history and his service in the military. The court found it strange defendant's witnesses, who stated they knew him so well and for so long, had never met M.G., given the length of time she had lived with him. The court stated, "So I guess, [defense counsel], to answer your question who would move in with a rapist, it would be a desperate 18 year old girl with no place to live."

¶ 41 3. *Motion to Reconsider the Motion for New Trial*

*and Motion to Reconsider Sentence*

¶ 42 Defendant filed a motion to reconsider the motion for new trial and a motion to reconsider sentence. In his motion to reconsider the motion for a new trial, defendant argued he was denied the opportunity to support his claim of ineffective assistance of counsel with evidence because the trial court refused to hold an evidentiary hearing to allow him to do so. Defendant's motion to reconsider sentence contained a single assertion: "Defendant received an

excessive sentence."

¶ 43    A hearing was held on these pending motions in November 2024. The trial court denied defendant's motion to reconsider the motion for a new trial, stating there must be some evidence to support defendant's position that he did not receive effective assistance of counsel to warrant holding an evidentiary hearing. The court concluded the motion for a new trial in this case was "very vague and did not identify any basis upon which this Court could determine whether or not he had received ineffective assistance of counsel." Thereafter, defense counsel withdrew the motion to reconsider sentence, and it was not heard or ruled upon by the trial court.

¶ 44    This appeal followed.

¶ 45                        II. ANALYSIS

¶ 46    Defendant raises the following issues on appeal: (1) the State failed to prove him guilty of criminal sexual assault beyond a reasonable doubt because there was no evidence he used or threatened force, (2) the trial court improperly admitted testimony of the victim regarding prior instances of sexual assault perpetrated by defendant, (3) his trial counsel was ineffective for failing to present evidence of defendant's acquittal of a prior criminal sexual abuse charge involving the victim, (4) his convictions violate the one act, one crime doctrine, and (5) his sentence was excessive.

¶ 47                    A. Sufficiency of the Evidence

¶ 48    Defendant challenges the sufficiency of the evidence regarding his conviction for criminal sexual assault. Defendant was charged by information of committing criminal sexual assault, which required the State to prove defendant committed an act of sexual penetration with the use of force or threat of force by placing his penis in her vagina. See 720 ILCS 5/11-1.20(a)(1) (West 2020). His sole contention regarding the sufficiency of the evidence is that

his conviction must be reversed because the State failed to prove he used or threatened force.

¶ 49        When faced with a challenge to the sufficiency of the evidence, "a reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Jackson*, 2020 IL 124112, ¶ 64. "Under this standard of review, it is the responsibility of the trier of fact to fairly *** resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." (Internal quotation marks omitted) *Id.* (quoting *People v. Howery*, 178 Ill. 2d 1, 38 (1997), quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979))). It is not the function of a reviewing court to retry a defendant; thus, this court will not substitute its judgment for that of the trier of fact on issues regarding the weight of the evidence or the credibility of witnesses. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224-25 (2009). "A criminal conviction will not be set aside on a challenge to the sufficiency of the evidence unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *Jackson*, 2020 IL 124112, ¶ 64.

¶ 50        Section 11-0.1 of the Criminal Code of 2012 (720 ILCS 5/11-0.1 (West 2020)) defines "[f]orce or threat of force" as follows:

>   "the use of force or violence or the threat of force or violence, including, but not limited to, the following situations:
>
>>   (1) when the accused threatens to use force or violence on the victim or on any other person, and the victim under the circumstances reasonably believes that the accused has the ability to execute that threat; or

(2) when the accused overcomes the victim by use of superior strength or size, physical restraint, or physical confinement."

In the context of criminal sexual assault allegations, "force" requires something more than the force inherent in the sexual penetration itself. *People v. Alexander*, 2014 IL App (1st) 112207, ¶ 54. "A conviction for criminal sexual assault cannot be sustained by merely establishing that the victim did not consent." *Id.* ¶ 52. However, there is no definite standard setting for the *amount* of force necessary to establish criminal sexual assault by the use or threat of force, and each case must be considered on its own facts. *People v. Vasquez*, 233 Ill. App. 3d 517, 527 (1992). "Physical resistance or demonstrative protestations are not necessary to demonstrate that a victim was forced to have sexual intercourse, and the absence thereof does not establish consent if the victim was threatened or in fear of being harmed." *People v. Mpulamasaka*, 2016 IL App (2d) 130703, ¶ 74; but see *Vasquez*, 233 Ill. App. 3d at 528 (finding although the law does not require "useless acts of resistance," the facts in that case showed resistance would probably have been successful; thus, force was not established). Further, force can be established by evidence that a defendant used his bodily inertia to prevent the victim from disengaging. *Mpulamasaka*, 2016 IL App (2d) 130703, ¶ 74.

¶ 51        After reviewing M.G.'s account of the assault that took place on March 29, 2021, and the entirety of the evidence presented in this case, we conclude the evidence of force or threat of force was not so improbable or unsatisfactory that it created a reasonable doubt of defendant's guilt.

¶ 52        M.G. testified, when she turned 18 and was kicked out of the home by her abusive adoptive mother, she moved in with defendant, her adoptive father and biological grandfather, because she had nowhere else to go. After reporting the May 2019 sexual assault, M.G. moved

out for a few months, living in different places, including a homeless shelter. She moved back to defendant's apartment because she was scared and, again, had nowhere else to go, and she believed the abuse would not happen again because she thought she had done "something wrong or something to cause the sexual abuse that happened." Defendant took care of M.G., and she testified he had "always been there" for her. M.G. stated defendant abused her on numerous occasions while she was living with him, but when it occurred on March 29, 2021, things changed; she reached out and someone helped her.

¶ 53    After dinner on that date, M.G. said goodnight to defendant, like she always had, by kissing him on the forehead and retired to her bedroom. Defendant followed her, stood in her doorway, removed his clothes, put on a condom, ordered her to remove her underwear, got on top of her in her bed, and had sexual intercourse with her. M.G. testified she did not want it to happen and said she was not able to get away. She stated defendant was physically bigger than her. While it was happening, M.G. stated she was thinking that she "couldn't do anything about it and he's way, like I wouldn't be able to get him off." When he was finished and left the room, M.G. was "super upset" and crying, and she contacted a number of people, including her biological father, who was located in Texas at the time, via video chat and told them what had happened. M.G. stated her biological father tried to convince her to contact the police, but she refused because, as she stated, she "had nowhere to go" and had "nothing." M.G.'s biological father contacted the police, and M.G. stated she was upset and scared because she did not know what would happen. M.G. waited in her room for the police to arrive.

¶ 54    The evidence revealed more than just a lack of consent—it revealed that M.G. was isolated, alone, controlled, and physically compelled by defendant to engage in the sex act against her will. M.G. believed she could not get away, and when it was happening, she stated

- 19 -

she knew, because of his size, she could not get him off of her. Physical resistance or demonstrative protestations are not necessary to demonstrate a victim was forced to have sexual intercourse. Further, the trial court saw and heard M.G.'s testimony and was in the best position to assess her credibility. See *People v. Herman*, 407 Ill. App. 3d 688, 704 (2011). The court found M.G. to be a credible witness, noting she was a "very shy, quiet young lady," who seemed "sad" but also "genuine and sincere with her testimony." To overturn the court's judgment, the evidence must be " 'so unsatisfactory, improbable or implausible' " that it raises reasonable doubt as to the defendant's guilt. *People v. Butler*, 375 Ill. App. 3d 269, 274 (2007) (quoting *People v. Slim*, 127 Ill. 2d 302, 307 (1989)). We conclude the evidence in this case supports defendant's conviction for criminal sexual assault with the use or threat of force beyond a reasonable doubt.

¶ 55                    B. Admission of Prior Instances of Sexual Assault

¶ 56            Defendant contends the trial court erred in allowing M.G. to testify he started sexually abusing her soon after she moved back into his apartment in September 2019 and the abuse continued regularly until the incident that she finally reported to the police on March 29, 2021. He contends this uncharged other-crimes evidence was not properly admitted under section 115-7.3(b) of the Code. 725 ILCS 5/115-7.3(b) (West 2022). Although defendant made a contemporaneous objection during trial when this evidence was admitted, he acknowledges he failed to preserve this claim of error by including it in his posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) ("*Both* a trial objection *and* a written post-trial motion raising the issue are required for alleged errors that could have been raised during trial." (Emphases in original.)). Therefore, this court will consider this issue only if defendant can establish plain error.

¶ 57 The plain error doctrine is "a narrow and limited exception to the general waiver rule." (Internal quotation marks omitted.) *People v. Herron*, 215 Ill. 2d 167, 177 (2005); see Ill. S. Ct. R. 615 (a) (eff. Jan. 1, 1967). This doctrine allows a reviewing court to consider a forfeited error affecting substantial rights in two circumstances:

> "(1) when a clear and obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) when a clear or obvious error occurred and the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Moon*, 2022 IL 125959, ¶ 20.

Our first step in the plain error analysis is to determine whether any error occurred at all. *People v. Eppinger*, 2013 IL 114121, ¶ 19. "If error did occur, we then consider whether either prong of the plain-error doctrine has been satisfied." *People v. Sykes*, 2012 IL App (4th) 111110, ¶ 31 (citing *People v. Sargent*, 239 Ill. 2d 166, 189-90 (2010)). Making this determination requires a " 'substantive look' " at the purported error. *People v. Johnson*, 208 Ill. 2d 53, 64 (2003) (quoting *People v. Keene*, 169 Ill. 2d 1, 17 (1995)). However, if no error occurred, there can be no plain error, and the principles of forfeiture apply. *Eppinger*, 2013 IL 114121, ¶ 19.

¶ 58 Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011) provides, absent an enumerated statutory exception, evidence of "other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Such other-crimes evidence may be admissible for other purposes, including "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* Section 115-7.3(a)(1) of the Code (725 ILCS 5/115-7.3(a)(1) (West 2022)) provides one of

the exceptions mentioned in Rule 404. Under this provision, the admission of other-crimes evidence is permitted to show propensity when a defendant is charged with one of the enumerated sex offenses in the statute, which includes criminal sexual assault. *Id.* Such evidence "may be admissible (if that evidence is otherwise admissible under the rules of evidence) and may be considered for its bearing on any matter to which it is relevant." *Id.* § 115-7.3(b). Our supreme court has held this provision allows courts to consider evidence of other crimes "for any matter, including propensity, so long as the evidence is relevant." *People v. Donoho*, 204 Ill. 2d 159, 172 (2003). Furthermore, the court must ensure the "probative value [of the evidence] is not substantially outweighed by its prejudicial effect." (Internal quotation marks omitted.) *People v. Watts*, 2022 IL App (4th) 210590, ¶ 41. When seeking to admit such evidence, the State "must disclose the evidence, including statements of witnesses or a summary of the substance of any testimony, at a reasonable time in advance of trial, or during the trial if the court excuses pretrial notice on good cause shown." 725 ILCS 5/115-7.3(d) (West 2022); Ill. R. Evid. 404(c) (eff. Jan. 1, 2011).

¶ 59 Decisions regarding the admissibility of other-crimes evidence rest within the sound discretion of the trial court and will not be disturbed on appeal absent a clear abuse of discretion. *Watts*, 2022 IL App (4th) 210590, ¶ 65. A trial court abuses its discretion if its decision is "arbitrary, fanciful or unreasonable or where no reasonable [person] would take the view adopted by the trial court. (Internal quotation marks omitted.) *Donoho*, 204 Ill. 2d at 182. Furthermore, "[e]rroneous admission of other crimes evidence calls for reversal only if the evidence was a material factor in the defendant's conviction such that, without the evidence, the verdict likely would have been different." (Internal quotation marks omitted.) *Watts*, 2022 IL App (4th) 210590, ¶ 65.

¶ 60    Defendant contends the State failed to disclose M.G.'s testimony about other instances of sexual abuse committed by defendant between May 5, 2019, and March 29, 2021, prior to trial and failed to show good cause as to why it was not disclosed. Defendant argues further that this evidence was substantially more prejudicial than probative "in light of the volume of evidence and the overall lack of reliability of M.G.'s vague testimony about these alleged acts." The State contends it was not seeking the admission of the evidence to show defendant's propensity to commit sex crimes; instead, it was admitted to show the relationship and familiarity between the parties and to corroborate the witness's testimony.

¶ 61    After our careful review of the record, we determine the trial court did not abuse its discretion in allowing M.G. to testify defendant had abused her on multiple occasions after she moved back into his home in 2019 and up until the day of the incident she reported to the police in March 2021.

¶ 62    We first note defendant's reliance on the State's obligation to show good cause for failing to disclose this evidence prior to trial is uncompelling. The record shows defendant objected to the line of questioning regarding this other-crimes evidence and the trial court heard arguments from both sides, including defendant's contention the State failed to show good cause as to why the evidence was not disclosed prior to trial. The court took a brief recess to consider the matter, and, thereafter, it ruled the evidence was admissible. Under these circumstances, we presume the trial court considered the matter and, by allowing the evidence, deemed there was good cause for allowing its admission despite the late disclosure.

¶ 63    Further, M.G.'s testimony was close in time and factually similar to the crime charged in this case and had probative value to establish the relationship and familiarity between her and defendant in this case. See *People v. Park*, 245 Ill. App. 3d 994, 1002 (1993) ("[W]hen

sex crimes are involved, prior acts between the same parties are generally admissible to show the relationship and familiarity between the parties and to corroborate the complaining witness'[s] testimony as to the act relied upon for conviction."). We also note defendant in this case was tried in a bench trial rather than a jury trial. "The rule generally barring other-crimes evidence is based on the belief that the introduction of the evidence may over-persuade a jury to convict a defendant only because the jury believes the defendant is a bad person deserving punishment." *People v. Nash*, 2013 IL App (1st) 113366, ¶ 24 (citing *Donoho*, 204 Ill. 2d at 170). That fear is "assuaged" when the case involves a bench trial because it is presumed the court will consider the evidence for the limited purpose for which it was introduced. *Id*. (citing *People v. Deenadayalu*, 331 Ill. App. 3d 442, 450 (2002)). As such, we find no error occurred when the trial court allowed the admission of other-crimes evidence. Because no error occurred, there can be no plain error.

¶ 64        Defendant argues in the alternative he was denied effective assistance of counsel when his attorney failed to include this claim of error regarding other-crimes evidence in his posttrial motion, thus forfeiting the issue on appeal. To make a claim of ineffective assistance of counsel, a defendant must show (1) his counsel's performance was so deficient that it fell below an objective standard of reasonableness and (2) there was a reasonable probability that, but for counsel's unprofessional performance, the result of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984). Because we have determined that no error occurred when the trial court made this evidentiary ruling, defendant's claim of ineffective assistance of counsel for failing to properly preserve the issue for review is without merit.

¶ 65                     C. Ineffective Assistance of Counsel: Failure to

Present Evidence of Prior Acquittal

¶ 66            Defendant contends he was denied effective assistance of trial counsel because his

attorney failed to seek to introduce evidence he had been acquitted of criminally sexually

abusing M.G. in 2014, when she was 12 years old. Citing *People v. Ward*, 2011 IL 108690,

¶¶ 25-52, defendant contends, where evidence of a past offense was introduced for propensity

purposes, fairness generally requires a court to allow an accused to introduce the fact that he was

acquitted of the prior offense to rebut the inference of propensity. In this case, the State was

allowed to present evidence of the alleged criminal sexual assault defendant committed on May

5, 2019, as well as testimony regarding other incidents between that date and March 28, 2021;

therefore, defendant argues, his counsel should have sought the admission of his acquittal by

directed verdict in the 2014 criminal sexual abuse case involving M.G.

¶ 67            All criminal defendants have the constitutional right to the effective assistance of

counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. Defendant's claims of

ineffective assistance of counsel are reviewed under the familiar standard set forth in *Strickland*.

*People v. Jones*, 2023 IL 127810, ¶ 51. We already set forth the two-pronged standard for

assessing ineffective assistance of counsel claims. *Supra* ¶ 64. Failure to establish either prong of

the test precludes a finding of ineffective assistance of counsel. *Supra* ¶ 64. When a claim of

ineffective assistance of counsel is not raised at the trial court level, the matter is reviewed by

this court *de novo*. *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 85.

¶ 68            Defendant contends he was denied a fair trial because his trial counsel should

have sought the admission of evidence that he was charged with, but acquitted of, criminal

sexual abuse of M.G. when she was 12 years old as a way to counter the other propensity

evidence presented by the State. We find this argument unpersuasive.

¶ 69 First, defendant's reliance on *Ward* is misplaced. In *Ward*, 2014 IL 121725, ¶ 2, the defendant was convicted of criminal sexual assault. During his trial, the trial court admitted evidence the defendant had also been involved in the criminal sexual assault of another woman as other-crimes evidence to show defendant's propensity to commit sex crimes. *Id.* ¶ 1. Thereafter, the defendant sought to admit evidence he was acquitted of the charge in the previous case, but the trial court denied his request. *Id.* On appeal, the supreme court reversed. The court explained the probative value of the acquittal evidence as follows:

> "Without the benefit of even the general knowledge that defendant was acquitted of assaulting [the victim in the prior case], the jury could easily have been swayed after hearing only parts of the story. Here, the probative value of the acquittal evidence is in its ability to provide the jury with a more complete context for [the prior victim's] testimony. While the [current victim's] jury still had an independent duty to determine the credibility of her testimony and evaluate its weight, the acquittal evidence would have provided another part of the picture that was otherwise sorely absent." *Id.* ¶ 40.

The court further found the potential for prejudice to the defendant if the other-crimes evidence were admitted without the admission of the acquittal was "readily apparent," noting the "inherently high, and often overly persuasive, probative value of such propensity evidence" and "the need to avoid unfair prejudice by providing a full context for the other-crimes testimony." *Id.* ¶ 46. The court concluded, "Given the real possibility the jury would convict defendant based on his alleged prior bad acts alone, barring the acquittal evidence further enhanced the already high danger of undue prejudice against him." *Id.*

¶ 70        The important distinction between the case before us and *Ward* is that the 2012

sexual abuse case against defendant was *not* presented by the State as other-crimes evidence.

Therefore, the concern the trier of fact was only presented with part of the story and required

more context to understand the facts in the prior case is not present here, as the court was not

presented with the 2012 case at all. Similarly, there can be no prejudice caused by the trial court

not being informed about the acquittal in the prior case when the court in this case was not

presented any evidence regarding that prior case.

¶ 71        Further, we find defendant's contention his counsel should have sought admission

of evidence of yet another criminal charge that had been filed against him by the same victim

when she was 12 years old and his acquittal of those charges as evidence to counter *other*

propensity evidence is, at best, questionable strategy. Although defendant contends this evidence

could have countered M.G.'s claims of ongoing abuse by showing defendant was acquitted of

abusing her in the past, this strategy would also require bringing attention to the fact this

defendant had, in fact, been charged for sexually abusing M.G. years before, when she was a

minor; thus, the evidence had the danger of causing its own prejudice against defendant.

Importantly, "the mere fact of acquittal does not necessarily mean that defendant did not commit

the alleged other offense; instead, it shows that the State was unable to prove every element of its

case beyond a reasonable doubt." *People v. Baldwin*, 2014 IL App (1st) 121725, ¶ 73. Defense

counsel's strategic efforts to prevent such prejudice is shown in the record where she objected

when the State asked M.G. why her visits with defendant stopped when she was 12 years old and

it was mentioned there was an order of protection issued at that time. The court admonished the

State not to go into this matter, and the State did not question M.G. about the topic further, only

stating she was not allowed contact with defendant at that time. "A strong presumption exists

that defense counsel's conduct was within the wide range of reasonable professional assistance and all decisions were made in the exercise of reasonable professional judgment." *People v. Carroll*, 2024 IL App (4th) 231207, ¶ 86. "Matters of trial strategy are generally immune from claims of ineffective assistance of counsel." (Internal quotation marks omitted.) *People v. Manning*, 241 Ill. 2d 319, 327 (2011). Defendant has failed to overcome the strong presumption his trial counsel's decision to forgo using the 2012 sexual abuse case was likely the product of sound trial strategy. See *id.* Defense counsel made a deliberate choice to avoid raising the question of whether defendant's abusive conduct with M.G. may have started as far back as when she was 12 years old, which could further explain the coercive nature of his relationship with her when she reconnected with him at age 18. Therefore, we conclude defendant has failed to establish his trial counsel's performance fell below an objective standard of reasonableness or otherwise constituted ineffective assistance of counsel.

¶ 72                              D. Once-Act, One-Crime Rule

¶ 73        Defendant claims his convictions and sentences for criminal sexual assault and sexual relations within families violated the one-act, one-crime rule. The State agrees.

¶ 74        Initially, we note defendant forfeited this claim by failing to raise this issue in the trial court. See *Enoch*, 122 Ill. 2d at 186. However, Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967), provides "[p]lain errors or defects affecting substantial rights may noticed although they were not brought to the attention of the trial court." A one-act, one-crime rule violation affects the integrity of the judicial process, and thus, it is reviewable under the second prong of the plain error doctrine. *People v. Smith*, 2019 IL 123901, ¶ 14. Whether the trial court violated the one-act, one-crime rule is a question of law subject to *de novo* review. *People v. Coats*, 2018 IL 121926, ¶ 12.

¶ 75 The one-act, one-crime rule provides "a criminal defendant may not be convicted of multiple offenses when those offenses are all based on precisely the same physical act." *Id.* ¶ 11. In this case, the State proceeded to trial on only two of the four counts charged in the information against defendant—counts I and III. The parties agree, as does this court, the allegations in count I and count III involved the same physical act of penetration occurring on March 29, 2021. As such, only one conviction was proper.

¶ 76 When the one-act, one-crime rule has been violated, a defendant's "sentence should be imposed on the more serious offense and the less serious offense should be vacated." *People v. Artis*, 232 Ill. 2d 156, 170 (2009). Here, the criminal sexual assault charge is a Class 1 felony (720 ILCS 5/11-1.20(b)(1) (West 2020)) and the sexual relations within families charge is a Class 3 felony (*id.* § 11-11(b)). Thus, we vacate defendant's conviction and sentence for sexual relations within families under the one-act, one-crime rule.

¶ 77                                 E. Defendant's Sentence

¶ 78 Defendant contends his 12-year sentence for criminal sexual assault was excessive because the trial court failed to adequately weigh his potential for rehabilitation and improperly placed emphasis on a fact not supported by the evidence when the court misstated the evidence regarding the DNA found on the condom located in the kitchen garbage as being from semen. Defendant acknowledges he failed to preserve this issue for appeal, but he argues for review under the plain error doctrine. Alternatively, defendant argues this court should find he was denied effective assistance of counsel for failure to raise this issue at trial.

¶ 79 "It is well settled that, to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required." *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). By failing to object at the sentencing hearing and

subsequently withdrawing his motion to reconsider sentence before a hearing was held, defendant has forfeited this issue. Consequently, we may review this claim of error only if defendant can establish plain error. As previously discussed, the plain error doctrine allows a reviewing court to consider a forfeited error affecting substantial rights in two circumstances. *Moon*, 2022 IL 125959, ¶ 20. However, our first task in the analysis is to determine whether any error occurred at all. See *Eppinger*, 2013 IL 114121, ¶ 19.

¶ 80　　　　The Illinois Constitution provides sentences are to be "determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. "This constitutional mandate calls for balancing the retributive and rehabilitative purposes of punishment, and the process requires careful consideration of all factors in aggravation and mitigation." *People v. Daly*, 2014 IL App (4th) 140624, ¶ 26. Trial courts have broad discretionary powers in imposing sentences because, having observed the proceedings, they are in the best position to "weigh such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). As such, a trial court's sentencing decisions are entitled to great deference and will not be overturned on appeal absent an abuse of discretion. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). "A sentence will be deemed an abuse of discretion where the sentence is 'greatly at variance with the spirit and purpose of the law, or manifestly disproportion to the nature of the offense.' " *Id.* (quoting *Stacey*, 193 Ill. 2d at 210).

¶ 81　　　　We initially note defendant's sentence in this case fell within the applicable sentencing range and is, therefore, presumptively valid. See *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 12. Nonetheless, defendant contends the trial court's decision must be reversed

because its consideration of certain evidence and statutory factors was erroneous. We disagree.

¶ 82 Defendant's contention that the trial court "placed excessive emphasis on a fact not supported by the evidence—that [defendant's] semen was found on the condom police recovered from the kitchen garbage on May 5, 2019" is disingenuous. At that time, the trial court was commenting on defense counsel's cross-examination of Wright, stating,

> "There was also testimony to suggest that what was located on that condom was actually sperm as opposed to *** a hair sample or something like that, and that it was highly unlikely that these DNA profiles would be located on that condom from other garbage that was contained in the garbage can."

Previously, the court had correctly referred to the samples extracted from the outside of the condom as containing both female and male DNA and noted the "male DNA sample came back as one in 1.7 billion chance" that it was from defendant. Although the court's reference to the source of the DNA being "sperm" was inaccurate (defendant's DNA was found on the condom but there were "no sperm cells present"), this comment was but one part of the court's recitation of the facts and the timeline of events that occurred in this case. "The remarks of the trial court at sentencing must be taken in context, and read in their entirety, including arguments of counsel." *People v. Young*, 138 Ill. App. 3d 130, 142 (1985). There is nothing in the record to suggest the trial court's sentencing decision turned on this reference to evidence from the 2019 incident.

¶ 83 The record reveals the trial court prefaced these comments by stating, "I do think it's important at this juncture for the Court to reiterate a few things about the trial in this case." The court noted the fact that several months into the investigation of the 2019 sexual assault allegations and while laboratory testing was being performed, M.G. contacted police indicating she wanted the charges dropped. The court emphasized that M.G. never "recant[ed] her story"

- 31 -

and "never said it did not happen." The court reiterated M.G. never said she "made it up," but she wanted the charges dropped because she had nowhere else to live. The court went on to discuss the DNA evidence in the case and then revealed the greater point it was making with the recitation of the timeline, stating, "So I guess, [defense counsel], to answer your question who would move in with a rapist, it would be a desperate 18 year old girl with no place to live."

¶ 84        We find similarly unpersuasive defendant's contention the trial court failed to consider defendant's rehabilitative potential as a factor in sentencing. While rehabilitative potential is a factor in sentencing, a sentencing judge is not required to give it greater weight than other factors, including the seriousness of the crime. *People v. Kendrick*, 2023 IL App (3d) 200127, ¶ 50. Further, "it is presumed that the trial court considered all mitigating factors, including rehabilitative potential, and the burden is upon the defendant to show the contrary." *People v. Connery*, 296 Ill. App. 3d 384, 391 (1998).

¶ 85        In this case, the trial court stated it considered the evidence presented, including the PSI, in light of the statutory factors in aggravation and mitigation in making its sentencing determination. The court explained, "The statute also requires the Court to consider the very serious nature of the charges, the financial cost of incarceration, and a number of other factors; and I have considered all of the factors that the statute requires me to take into consideration." The court then spoke in detail about two factors (the serious harm caused to M.G. and the need for deterrence), noting these factors "stand out in [the court's] mind." Notably, the court acknowledged it had reviewed the PSI. Although the court only commented on defendant's military service and lack of a criminal record as mitigating factors, the record reveals the report also included, *inter alia*, defendant's age, his family and social history, his mental and physical health, his thoughts about possible sentences, and the investigator's remarks, which included

defendant's risk level assessment. Defendant has failed to point to explicit evidence in the record to overcome the presumption the court considered his rehabilitative potential when issuing his sentence. See *People v. Flores*, 404 Ill. App. 3d 155, 158 (2010). As such, we find no error occurred when the court made its sentencing determination; thus, defendant cannot establish plain error.

¶ 86        Defendant argues in the alternative he was denied effective assistance of counsel when his attorney withdrew his motion to reconsider sentence, thus forfeiting a challenge to his sentence on appeal. As previously stated, to establish ineffective assistance of counsel during sentencing, a defendant must show (1) counsel's performance fell below minimal professional standards and (2) a reasonable probability exists the defendant's sentence was affected. *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 88. Because we have determined no error occurred when the trial court made its sentencing determination, defendant's claim of ineffective assistance of counsel for failing to properly preserve the issue for review is without merit.

¶ 87                                    III. CONCLUSION

¶ 88        For the reasons stated, defendant's conviction and sentence for criminal sexual assault (720 ILCS 5/11-1.20(a)(1) (West 2020)) is affirmed and his conviction and sentence for sexual relations within families (*id.* § 11-11(a)) is vacated.

¶ 89        Affirmed in part and vacated in part.